**CAYMAN TURTLE FARM, LTD., Plaintiff,**

v.

**Cecil D. ANDRUS, Secretary, Dept. of Interior, Juanita M. Kreps, Secretary, Department of Commerce, Defendants,**

and

**Environmental Defense Fund, Inc., et al., Intervenor-Defendants.**

Civ. A. No. 78–1661.

United States District Court, District of Columbia.

May 29, 1979.

Richard L. Lapidus, Miami, Fla., Wm. Bradford Reynolds, Shaw, Pittman, Potts & Trowbridge, Washington, D. C., for plaintiff.

Rebecca A. Donnellan, Dept. of Justice, Washington, D. C., for federal defendants.

Michael J. Bean, Wm. A. Butler, Environmental Defense Fund, Inc., Washington, D. C., for intervenor-defendants.

MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Plaintiff Cayman Turtle Farm, Ltd., operates a marine farm, or mariculture operation, on Grand Cayman Island, Cayman Islands, British West Indies, where it breeds green sea turtles in captivity for scientific and commercial purposes. The Company's farmed turtle products, which are exported to the United States and other countries, consist of turtle shell jewelry, steak, soup, meat, leather and turtle oil. In this action, plaintiff specifically seeks to invalidate and enjoin enforcement of the regulations issued by defendant Cecil D. Andrus, Secretary of the Interior, and Juanita M. Kreps, Secretary of Commerce, under the authority of the Endangered Species Act of 1973, 87 Stat. 884, 16 U.S.C. §§ 1531–43 (hereinafter cited as ESA) insofar as these regulations prohibit the importation and trade in the United States of all green sea turtle products produced in mariculture operations.

Plaintiff has filed a motion for summary judgment in which it advances three arguments in support of its position that the Secretaries should be enjoined from prohibiting the importation and trade of farm green sea turtles: (1) the regulations promulgated by the Secretaries are in excess of their authority under the Endangered Species Act of 1973; (2) the regulations are contrary to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, 27 U.S.T. 1087, T.I.A.S. No. 8247 (hereinafter referred to as Convention); and (3) the regulations are without support in the administrative record. The Government of the Cayman Islands has filed an *amicus curiae* brief in support of plaintiff's motion for summary judgment. The defendant Secretaries and intervenors Environmental Defense Fund, Inc., et al., have filed cross-motions for summary judgment. We find that there are no genuine issues of material fact which would prevent the grant of a summary judgment. For reasons discussed below, we deny the plaintiff's motion for summary judgment and grant the motions for summary judgment filed by defendants and intervenors.

I. *Procedural History*

The administrative regulations challenged in this action have a lengthy procedural history, which we set forth in considerable detail. On August 9, 1974, Dr. F. Wayne King, Director of Conservation and Environmental Education of the New York Zoological Society, pursuant to 16 U.S.C. § 1533(c)(2) petitioned the Department of Commerce and Interior to list the green sea turtle as endangered and the loggerhead and Pacific ridley turtles as threatened under the Endangered Species Act of 1973. On August 16, 1974, an announcement was made in the Federal Register that the United States Fish and Wildlife Service ("USFWS") of the Department of the Interior and the National Marine Fisheries Service ("NMFS") of the Department of Commerce would conduct a formal joint review under the Endangered Species Act of 1973 to ascertain the status of green, loggerhead and Pacific ridley sea turtles. 39 Fed.Reg. 29,605 (August 16, 1974). On May 20, 1975, USFWS and NMFS published in the Federal Register a proposed regulation listing green, loggerhead and Pacific ridley sea turtles as threatened species. Among other things, the proposed regulations provided an exception for the importation, exportation, taking and transporting of sea turtles (and their parts and products) derived from mariculture operations with the provision that after two years the exception would apply only to turtles derived from closed-cycle farming operations which were self-sustaining and independent of wild stocks. 40 Fed.Reg. 21,974, 21,977 (May 20, 1975). The proposed sea turtle regulations invited comments, suggestions, objections and factual information from interested persons. Numerous comments were received by USFWS and NMFS over an extended period of time. Many of these comments specifically addressed the proposed mariculture exception.

On August 20, 1975, notice was published in the Federal Register of the decision by NMFS to prepare an environmental impact statement on the proposal to list green,

loggerhead and Pacific ridley sea turtles as threatened species and to hold a public hearing following issuance of the draft environmental impact statement ("DEIS"). 40 Fed.Reg. 36,401 (August 20, 1975). The DEIS became available for public comment on February 6, 1976. 41 Fed.Reg. 5,426 (February 6, 1976). Notice was published in the Federal Register extending the comment period on the proposed regulations through March 22, 1976. 41 Fed.Reg. 5,413 (February 6, 1976).

Public hearings on the proposed listing of the three species of sea turtles and on the DEIS were held in Washington, D. C. on February 25–26, 1976. Scientists, conservationists, businessmen, shrimpers and representatives from state and foreign governments participated in the hearings. The transcript of those public hearings is part of the record below. Administrative Record (hereinafter cited as "R") XV B. On March 19, 1976, notice was published in the Federal Register extending the comment period on the DEIS until April 5, 1976. 41 Fed. Reg. 11,602 (March 19, 1976). Plaintiff Cayman Turtle Farm, Ltd. and its predecessor, Mariculture, Ltd., submitted comments on several different occasions to USFWS and NMFS in support of the mariculture exception in the proposed regulations. Plaintiff also participated in the public hearings of February 25–26, 1976 (R. XV B). The intervenor-defendants submitted comments in opposition to the mariculture exception in the proposed regulations and also participated in the public hearings. (R. XV B) On June 16, 1976, USFWS and NMFS published proposed regulations listing the green, Pacific ridley and loggerhead turtles as threatened under the similarity of appearance provision of the Endangered Species Act of 1973 because of their similarity to the endangered hawksbill, leatherback and Atlantic ridley. (R. XVII) 41 Fed.Reg. 24,378 (June 16, 1976).

On February 28, 1978, intervenor-defendant Environmental Defense Fund, Inc. ("EDF") requested that the public comment period on the proposed regulations be reopened to permit the submission of newly acquired evidence and related data. This request was granted and the comment period was extended to April 17, 1978. 43 Fed.Reg. 12,735 (March 27, 1978). USFWS and NMFS received additional comments from EDF and from plaintiff during the extended comment period. (R. XXI B 10, 11). A request by plaintiff for an opportunity to respond to the submission made by EDF was denied on April 10, 1978. (R. XXI A 1).

On July 28, 1978, USFWS and NMFS announced in the Federal Register the final regulations listing the loggerhead sea turtle as a threatened species; the green sea turtle as a threatened species in all areas except the Florida and Mexican Pacific coasts, where the populations were listed as endangered; and the Pacific ridley sea turtle as threatened everywhere except the Mexican Pacific coast, where the population was listed as endangered. These regulations prohibited, *inter alia*, all importation of these turtles with no exception for commercial mariculture operations. 43 Fed.Reg. 32,-800–32,811 (July 28, 1978).

By letter dated August 15, 1978, plaintiff formally requested USFWS and NMFS to reconsider the sea turtle regulations insofar as they failed to provide an exception for commercial mariculture activities, and to stay enforcement thereof as against plaintiff's turtle products being shipped to and through the United States pending such reconsideration. (R. XXIV A 1). The stay request was denied orally on August 31, 1978.

On September 5, 1978, plaintiff commenced the present action in the United States District Court for the District of Columbia to challenge the new turtle regulations and to enjoin enforcement of the prohibitions contained therein insofar as they are directed against commercial mariculture activities. The Environmental Defense Fund, Inc., Defenders of Wildlife, The Fund for Animals and World Wildlife Fund —U.S. sought leave to intervene as intervenor-defendants. We granted their motion for leave to intervene.

Following a hearing on plaintiff's application for a temporary restraining order, USFWS and NMFS agreed to a voluntary stay of enforcement of the regulatory prohibitions against commercial mariculture activities pending reconsideration by the agencies of the sea turtle regulations pursuant to plaintiff's request, and, if reconsideration was denied, pending the outcome of judicial review of that denial by the United States District Court for the District of Columbia. *See* Order of September 6, 1978.

On September 20, 1978, plaintiff submitted additional comments to USFWS and NMFS in support of its request for reconsideration. (R. XXIV A 22). On December 5, 1978, USFWS and NMFS issued a Decision Memorandum denying plaintiff's request to include in the sea turtle regulations an exception for commercial mariculture operations. (R. XXVIII) (hereinafter cited as Doc. Mem.).

## II. *Authority for Mariculture Ban Under the Endangered Species Act*

Plaintiff advances two principal arguments in support of its contention that the withdrawal of an exemption for plaintiff's mariculture activities is an act in excess of the defendant's authority under the Endangered Species Act of 1973. 16 U.S.C. §§ 1531–43. First, plaintiff argues that the mariculture ban is contrary to the Act's regulatory mandate to encourage the propagation of protected wildlife. ESA §§ 3(2), 10(a), 16 U.S.C. §§ 1532(2), 1539(a). Second, plaintiff argues that the Endangered Species Act of 1973 does not apply to captive-bred sea turtles which are hatched and raised in a controlled environment.

Defendants and intervenors do not dispute the plaintiff's general contention that a fundamental purpose of the Endangered Species Act of 1973 is to promote measures designed to protect species which are threatened with immediate or foreseeable extinction. Defendants and intervenor, however, do dispute that this general policy requires the establishment of a mariculture

exemption in the specific case of threatened or endangered sea turtles. Since plaintiff's argument rests upon the factual assumption that its mariculture operations facilitate the propagation of protected wildlife, we will later treat this argument in the context of plaintiff's challenge to evidentiary basis in the administrative record for the mariculture ban.

■ Plaintiff's second argument, that the Endangered Species Act of 1973 does not apply to captive-bred sea turtles which are hatched and raised in a controlled environment, is contrary to the clear language of the statute. As defendants and intervenors point out, section 9(b) of the Act, 16 U.S.C. § 1538(b) exempts from the prohibition of the Act only those specimens of a listed species which were "held in captivity or in a controlled environment on December 28, 1973," but not species of fish or wildlife "held in the course of a commercial activity." *See also* 50 C.F.R. § 17.4(c). While this language clearly evinces a legislative intent to include specimens reared in captivity and in controlled environments within the ambit of the Act, the Act carefully limits the captive specimen exemption to specimens which were (1) in a controlled environment as of December 28, 1973; and (2) not held in the course of a commercial activity. The specimens on the Cayman Turtle Farm cannot qualify for this exemption because they were held in the course of a commercial activity. Moreover, all turtles and the progeny of all turtles acquired after December 28, 1973, would also not qualify for this exemption.

■ Although section 9(b) of the Act, 16 U.S.C., § 1538(b), was intended to *exempt* listed specimens held in non-commercial zoos and held by private collectors,[1] it implicitly reflects the converse intent to *include* specimens of listed species in controlled environments. It would be plainly inconsistent with the comprehensive sweep of the Act to read into the Act a second

---

1.  *See, e. g.,* H.Conf.Rep.No.93–740, 93d Cong., 1st Sess. 27 (1973), *reprinted in* 1973 U.S.Code Cong. & Admin.News, at 3001, 3006 (1973).

exemption applicable to the limited situation where a captive or self-sustained population of a protected species is reared abroad. If Congress had intended to enact such a second exemption, it could have expressly drafted an exemption such as the one it recently drafted to apply to raptorial birds. *See* Pub.L.No.95–632, § 4, amending 16 U.S.C. § 1538(b). We therefore decline to further circumscribe the broad discretion which the Endangered Species Act of 1973 confers upon Secretaries who are responsible for promulgating protective regulations for threatened and endangered species. *See, e. g.*, ESA § 4(d), 16 U.S.C. § 1533(d), S.Rep.No.93–307, 93d Cong., 1st Sess. 3 (1973); H.Rep.No.93–412, 93d Cong., 1st Sess. 12 (1973), U.S.Code Cong. & Admin. News 1973, p. 2989. We accordingly find that the challenged sea turtle regulations are authorized by the Endangered Species Act of 1973.

### III. *Authority for Mariculture Ban Under the International Convention*

Plaintiff also contends that the mariculture ban imposed by the Secretaries is contrary to the Convention on International Trade in Endangered Species of Wild Fauna and Flora, 27 U.S.T. 1087, T.I.A.S., No. 8249 (effective July 1, 1975) (hereinafter referred to as "Convention"). The means by which the Convention regulates international trade in wild species is through the requirement that certain forms of documents must accompany shipments of protected species. Shipments of species most imminently threatened with extinction are listed in Appendix I of the Convention and may only be traded if they are accompanied by import and export permits which have been issued under certain conditions. Convention, Art. III, ¶ 2, 3. Species which *may* become threatened with extinction are listed in Appendix II of the Convention. These species may not be traded unless the country of export has issued a permit for their shipment. *Id.* at Art. IV, ¶ 4. Animal species which are listed in Appendix I but which are "bred in captivity for commercial purposes," are deemed to be included in Appendix II. Convention, Art. VII, ¶ 4.

Shipment of such species is permitted where an authority from the exporting nation certifies that the species is bred in captivity. *Id.* at Art. VII, ¶ 5.

The green sea turtle was listed in Appendix II when the Convention was negotiated in 1973 but was later transferred to Appendix I in November, 1976. *See* 42 Fed.Reg. 10,452 (Feb. 22, 1977). It has remained on Appendix I since that time. Consequently, trade in green sea turtles must meet the strict certification requirements for imminently threatened species unless the turtles are "bred in captivity." If the turtles are "bred in captivity," trade may be conducted in accordance with the less strict certification requirements applicable to species listed on Appendix II.

■ Plaintiff argues that since specimens bred in captivity are outside the scope of the Endangered Species Act of 1973, defendants are obligated under the Convention to permit trade in listed species including green sea turtles, which are bred in captivity. This argument, however, cannot survive our previous holding that animals bred in captivity are encompassed within the Endangered Species Act of 1973, even though the Act does not expressly address the specific situation of species bred in captivity overseas. It is significant that the Convention signatories recognized that domestic legislation may also provide protection for species which are covered by the Convention. Article XIV, ¶ 1 of the Convention provides:

> The provisions of the present Convention shall in no way affect the right of Parties to adopt . . . stricter domestic measures regarding the conditions for trade, taking, possession or transport of specimens of species included in Appendices I, II and III, or the complete prohibition thereof . . . .

The implementation of "stricter domestic measures," including "complete prohibition" of trade in a species will therefore supersede the minimum trade standards set forth in the Convention. In the promulgation of validly issued regulations which eliminated

the mariculture exemption for sea turtles bred in captivity, the defendants implemented such "stricter domestic measures." Thus, the defendant Secretaries acted under the authority of both the Endangered Species Act of 1973 and the Convention when they elected to remove the mariculture exemption.[2]

## IV.  *Review of Administrative Record*

### A.  *Standard of Review*

■ Administrative agency action only will be set aside if a review of the record below reveals that the challenged conduct is so lacking in evidentiary support that the action is arbitrary, capricious or an abuse of agency discretion.  *See* 5 U.S.C. § 706(2)(A) (1976);  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971);  *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1972);  *Environmental Defense Fund, Inc. v. Blum*, 458 F.Supp. 650, 657 (D.D.C.1978). In applying this standard, a Court must determine whether the decision was based upon a consideration of all relevant factors. *Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 416, 91 S.Ct. 814.  An agency's reasoning from these factors should be upheld if the conclusions reached are rationally supported.  *United States v. Allegheny-Ludlum Steel Corporation*, 406 U.S. 742, 749, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

■ A reviewing court is to be particularly deferential where an agency has been delegated discretion to reach decisions based upon technical and scientific data. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 545–46, 98 S.Ct. 1197, 1212–13, 55 L.Ed.2d 460 (1978);  *Federal Power Commission v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1971);  *Wyerhaeuser Co. v. Costle*, 191 U.S. App.D.C. 309, 324–325, 590 F.2d 1011, 1026–27 (D.C.Cir.1978).  The expertise required to assess disputed scientific facts properly lies within the province of the agency rather than the reviewing court.  At issue in this action is the technical question of the effect of a mariculture exemption for captive sea turtles upon the preservation of wild sea turtles.  We therefore accord a strong presumption of validity to the Secretaries' resolution of this scientific question by deciding to eliminate the proposed mariculture exemption from the sea turtle regulations.

### B.  *Record Support for Elimination of Mariculture Exemption*

■ We see no need for an extensive discussion of the administrative record of facts and policy concerns which support the Secretaries' decision to remove a proposed exemption for mariculture activities.  We will preface our discussion, however, by not-

---

**2.** Even assuming *arguendo* that the Convention provides the sole criteria for the importation of sea turtles into the United States, a substantial portion of plaintiff's turtles which would be shipped for export could not be classified as having been "bred in captivity" within the meaning of the Convention.  A recently adopted resolution at a Second Meeting of the Conference of the Parties held during March 19–30, 1979 provided:

> That the term "bred in captivity" shall be interpreted to refer only to progeny, including eggs, born, or otherwise produced in a controlled environment, either of parents that mated or otherwise transferred gometes in a controlled environment, if reproduction is sexual, or of parents that were in a controlled environment when development of the progeny began, if reproduction is asexual.

Sea turtle eggs taken from the wild and hatched in captivity are not "bred in captivity"

under this definition.  Yet, many of the turtles which plaintiff now slaughters and will in the immediate future slaughter have been hatched from eggs taken from the wild.  For example, plaintiff in 1977 acquired 20,800 wild sea turtle eggs.  Plaintiff's comments, September 20, 1978, at 12 (R. XXIV A 22).  If hatchlings from these eggs are slaughtered at age three or four, plaintiff's exports of sea turtles in 1980 and 1981 will be comprised of a substantial number of sea turtles which do not fall under the bred in captivity exception.  Implementation of a flat exemption for all of plaintiff's products would therefore clearly be contrary to the duty of the Secretaries to enforce the Convention. Trade in such turtles could only be accomplished by compliance with the strict requirements applicable to species which are listed on Appendix I of the Convention.

ing that the rulemaking at issue in this action was the product of proceedings which spanned nearly four years and which culminated in a voluminous record. Plaintiff and more than 70 other parties submitted comments which addressed a vast range of scientific and technical issues. Plaintiff has participated in these proceedings from the outset. In accordance with our order of September 6, 1978, plaintiff was even given the unique opportunity to present additional material in support of its position after the formal closing of the record. The Secretaries' final decision to eliminate a proposed mariculture exemption was therefore made after affording plaintiff a full and fair opportunity to present evidence in support of a mariculture exemption.

The defendant Secretaries advanced several facts and policy concerns in support of their decision to withdraw the proposed mariculture exemption from the sea turtle regulations. First, the Secretaries found that trade of commercial mariculture products would have a deleterious impact upon sea turtle populations in the wild. Second, the Secretaries found that the likely inadequacy of measures to enforce compliance with a mariculture exemption would also pose a threat to wild populations of sea turtles. Third, the Secretaries found that the benefits of scientific research which would accrue from a mariculture exemption do not outweigh the risks to the survival of wild sea turtle populations. Fourth, the Secretaries found that the Cayman Turtle Farm was not totally independent of wild eggs and wild turtles. *See* Dec. Mem. As will be discussed below, each of these findings has a reasonable basis of support in the administrative record.

### 1. *Deleterious Impact Upon Wild Sea Turtle Population*

The administrative record reveals that there is considerable uncertainty over the precise long-term impact of mariculture activities upon wild sea turtle populations but there is ample evidence to support a finding that such activities would be detrimental to the prospects for the survival of wild sea turtles. Evidence in the administrative record is adequate to support the finding that a mariculture exemption would provide an incentive for the establishment of other turtle farms which, like Cayman Turtle Farm, would at least initially be dependent upon eggs taken from the wild.[3] Even if other turtle farms attempted to acquire wild eggs which would not otherwise have hatched, there is a significant risk that, as in the case of Cayman Turtle Farm, eggs nevertheless may be procured from viable nests thereby depleting the potential stock of wild sea turtles.[4] Moreover, even if other farms procured doomed eggs, there is evidence in the record that the procurement of doomed eggs may reduce the total stock of viable eggs because predators, including man, may then have to resort to viable eggs to satisfy their existing consumptive demands for turtle eggs.[5]

Evidence in the record also supports the Secretaries' contention that the total number of wild sea turtles may be reduced by increased illegal poaching of wild sea turtles. The record contains evidence that plaintiff's marketing of sea turtle products would increase consumer demand for these products.[6] Increased demand would pro-

---

[3] The administrative record contains evidence that mariculture operations may be implemented in a number of regions of the world. *See* Dec. Mem. at 7–8, App. A (South Yemen); *Id.* at 7–8 (Ecuador, Malaysia, Indonesia and Hawaii).

[4] The very process of establishing a self-sustaining mariculture operation is virtually certain to require the procurement of many wild, potentially viable eggs and wild breeding adults. *See* Comments of New York Zoological Society, at 5, (R. VI C 19); Comments of Mari-

culture Ltd., April 5, 1976, at 23, (R. XVII A 121).

[5] *See* Comments of Dr. George H. Balazs, at 5 (R. XVII A 18); comments of Professor N. Mrosovsky, at 1 (R. VI C 11).

[6] Although plaintiff contends that its operation is simply a means to satisfy existing demand for sea turtle products, evidence in the record indicates that plaintiff, a commercial, profit-seeking business, may be seeking to increase its markets and expand the demand for these

vide a strong economic incentive for the illegal marketing of wild sea turtles. The likelihood of such illegal trade is increased by evidence indicating that the products of wild sea turtles are readily able to be substituted for the products of turtles reared at the Cayman Turtle Farm.[7] The record also contains evidence that such illegal trade has occurred and is increasing.[8] Evidence in the record was therefore more than ample to permit the Secretaries to conclude that the survival of wild sea turtles would be threatened by either the formation of additional turtle farms or by increased illegal poaching. Both of these consequences could reasonably flow from the implementation of a mariculture exemption.

## 2. *Inadequacy of Enforcement Measures*

The administrative record also adequately demonstrates that the Secretaries had a reasonable factual basis to conclude that the absence of adequate measures to enforce the mariculture exemption increases the likelihood that the products of wild sea turtles will be illegally imported into the United States. As noted previously, evidence in the record is sufficient to demonstrate that many farm sea turtle products, such as oil, soup ingredients, and shell sections, are virtually indistinguishable from wild sea turtle products.[9] The agencies are uniquely situated to determine whether they possess the requisite expertise and resources to enforce mariculture exemption at the points of importation or at other inspection sites. The agencies could reasonably conclude that these inspection and monitoring difficulties would be markedly exacerbated because of limited resources and jurisdictional authority to supervise foreign mariculture operations.

## 3. *Scientific Research Benefits of Mariculture Facilities*

The administrative record is also adequate to support the Secretaries' finding that the benefits of scientific research performed at the Cayman Turtle Farm do not outweigh the other risks to the species posed by mariculture exemption. The record does indicate that research into the propagation and development of the green sea turtle populations would continue at least at the Federal Government project in Galveston, Texas in the absence of a mariculture exemption for plaintiff's farm turtle products.[10] Conversely, as argued by intervenor, the record does not document the necessity of a mariculture exemption for continuation of those scientific benefits which have been facilitated by studies conducted at the Cayman Turtle Farm. Moreover, the record does support the agencies' conclusion that the scientific benefits from research conducted at Cayman Turtle Farm may constitute only a minimal contribution to the conservation of the sea turtle.[11] Without disparaging the quality of scientific research conducted at the Cayman Turtle Farm, the Secretaries could conclude that the benefits derived from this research were insufficient to justify the creation of a mariculture exemption.

## 4. *Self Sufficiency of the Operation*

Plaintiff devotes considerable discussion of the evidence in the record which supports their contention that Cayman Turtle Farm is a self-sufficient, closed-cycle operation completely independent of wild stocks of sea turtles. An initial point of contention is whether the Secretaries have properly defined the term "closed-cycle" to include only operations where all farm hatchlings are produced from parents which also were

---

products. *See, e. g.,* testimony of William Johnson, Hearing Transcript, at 122–24, 137–38 (R. XV B 1). *See also* Dec. Mem. and sources cited therein, 4–6.

7. *See, e. g.,* petition of Mariculture, Ltd., August 14, 1974 at 27 (R. IV) (calipee oil of wild and farm turtles is essentially the same); Dec. Mem. and sources cited therein at 13 (soup, raw shell sections and beads).

8. *See* Dec. Mem. and sources cited therein at 16–17.

9. *See* sources cited at note 7, *supra.*

10. *See* Dec. Mem. and sources cited therein at 22.

11. *See id.* at 20–24.

farm hatchlings.[12]  According to plaintiff, the term "closed-cycle" should be more loosely interpreted to refer to populations which can be sustained without further acquisition of wild stocks. The interpretation advocated by defendants and intervenor, however, is consistent with the protective policy of the Endangered Species Act of 1973. Moreover, the defendants' and intervenors' more strict definition of "closed-cycle" comports with the terms and underlying policy of the resolution adopted by the parties to the Convention.[13]

The Secretaries had adequate evidence in the record to conclude that plaintiff had not established a closed-cycle operation within the agencies' valid definition of that term. The record contains undisputed evidence that a significant percentage of the breeding herd and of the recent hatchlings were not born of parents which had mated on the farm.[14]  In addition, it may be premature to determine that the breeding cycle at Cayman Turtle Farm can be completed from farm laid egg to farm laid egg. According to testimony contained in the record, hatchlings from eggs first laid at the farm will not become sexually mature until the early 1980's.[15]  Thus, despite evidence of the apparent success of breeding efforts at the Cayman Turtle Farm, the Secretaries had sufficient information before them to conclude that plaintiff had not established the sort of closed-cycle operation which

could be entitled to a mariculture exemption if a mariculture exemption was otherwise warranted. However, since the Secretaries also had an adequate basis in the record to conclude that a general mariculture exemption would be contrary to their obligation under and the policies contained in the Endangered Species Act of 1973 and the Convention, the Secretaries' decision to eliminate a mariculture exemption can be sustained without regard to the definitional question of whether Cayman Turtle Farm can be deemed a "closed-cycle" or "self-sufficient" operation.

C.  *Reasonableness of Agency Decision on the Basis of the Administrative Record*

As should be apparent from the foregoing discussion, each of the Secretaries' explanations for the elimination of the mariculture exemption for sea turtles has an adequate factual and policy basis in the administrative record. Although the Secretaries had evidence that Cayman Turtle Farm could rear increasing numbers of sea turtles in a commercially successful manner, the Secretaries had a sufficient evidentiary basis to conclude that a mariculture exemption would threaten the existence of sea turtles in the wild. Elimination of the mariculture exemption was certainly a reasonable administrative response to the information adduced during the extensive administrative proceedings.

12. *See* Dec. Mem. at 26. In an earlier proposed regulation, the Secretaries indicated that a mariculture exemption permit may be issued "if the applicant or permittee can demonstrate to the satisfaction of the Director, that such wildlife is derived from a closed-cycle farming operation consisting of a captive-bred population which is completely self-sustaining and independent of wild stock." Proposed 50 C.F.R. § 17.32(e)(ii)(D), 40 Fed.Reg. 21,976 (May 20, 1975).

13. In interpreting the Convention term "bred in captivity," the parties to the Convention stated that "[t]he parental breeding stock must be to the satisfaction of the competent government authorities of the relevant country  .  .  . managed in a manner designed to maintain the breeding stock indefinitely." A parental breeding stock shall be considered to be "managed in a manner designed to maintain the breeding stock indefinitely only if it is managed in a manner which has been demonstrated to be

capable of reliably producing second-generation offspring in a controlled environment." Resolution of March 27, 1979, adopted at the second meeting of the Conference of the parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora.

14. Of the nearly 1000 breeding turtles at the Cayman Turtle Farm, approximately 220 were originally taken from the wild. Plaintiff's memorandum in support of motion for summary judgment at 25; Dec. Mem. at 24–28. Until recently, plaintiff has procured substantial numbers of wild turtle eggs. In 1977, for example, plaintiff acquired 20,800 wild turtle eggs. Comments of Cayman Turtle Farm, Sept. 20, 1978 (R. XXIV A 22).

15. Comments of Cayman Turtle Farms, Ltd., Ex. D, April 20, 1978, (R. XXIV A 22); Dec. Mem. and sources cited therein at 24–28.

*Conclusion*

After one of the most comprehensive administrative proceedings held under the authority of the Endangered Species Act of 1973, the Secretaries of the Interior and Commerce compiled an administrative record fully adequate to support the issuance of sea turtle regulations which did not contain an exemption for the commercial mariculture activities engaged in by plaintiff Cayman Turtle Farm. Those regulations, which were properly sensitive to the environmental interest in the preservation of threatened and endangered wild sea turtles, were authorized under the Endangered Species Act of 1973 and the Convention on International Trade in Endangered Species of Wild Fauna and Flora and should be sustained.