CABINET MOUNTAINS WILDERNESS/
SCOTCHMAN'S PEAK GRIZZLY
BEARS, et al., Appellants

v.

R. Max PETERSON, U. S. Forest
Service, et al.

No. 81–1671.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 19, 1982.

Decided Aug. 13, 1982.

Howard Irving Fox, Washington, D. C., with whom Karin P. Sheldon, Washington, D. C., was on the brief for appellants, Sierra Club and Defenders of Wildlife. Ronald J. Wilson, Washington, D. C., also entered an appearance for appellants, Sierra Club and Defenders of Wildlife.

Peter C. Wagstaff, Coeur d'Alene, Idaho, for appellants, Western Sanders County Involved Citizens and Cesar Hernandez.

Jerry Jackson, Atty., Dept. of Justice, Washington, D. C., with whom Edward J. Shawaker, Atty., Dept. of Justice, and Robert A. Maynard, Atty., Dept. of Agriculture, Washington, D. C., were on the brief for appellees, Peterson, et al. Donald A. Carr, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for appellees, Peterson, et al.

R. Brooke Jackson, Washington, D. C., with whom Susan L. Smith, Allston, Mass., was on the brief for appellee, ASARCO, Inc.

Before BORK, Circuit Judge, ROBB, Senior Circuit Judge, and JAMES F. GORDON,* United States District Judge for the Western District of Kentucky.

Opinion for the Court filed by Senior Circuit Judge ROBB.

ROBB, Senior Circuit Judge:

In this action in the District Court the plaintiffs challenged the decision of the United States Forest Service to approve a plan of operations for exploratory mineral drilling in the Cabinet Mountains Wilderness Area in Northwestern Montana.[1] The plaintiffs alleged the Forest Service action violated the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.* (1976 & Supp. IV 1980), and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.* (1976). ASARCO, Inc.[2] intervened as a defendant to protect its interest as the drilling permittee. On cross-motions for summary judgment the District Court upheld the Forest Service's decision. *Cabinet Mountains Wilderness v. Peterson*, 510 F.Supp. 1186 (D.D.C.1981). The plaintiffs appeal. We affirm the judgment of the District Court.

The Cabinet Mountains Wilderness Area consists of approximately 94,272 acres and is part of the Cabinet-Yaak ecosystem, one of only six ecosystems in the continental United States that supports populations of grizzly bears. The bears are listed as a threatened species under the ESA. *See* 50 C.F.R. § 17.11(h) (1981). Although it is estimated that only about a dozen grizzly bears may inhabit a portion of the Cabinet Mountains area where drilling will take place, the area has been recognized as having a high potential for grizzly bear management.

ASARCO holds a claim block consisting of 149 unpatented mining claims totalling 2,980 acres, most of them located in the Cabinet Mountains Wilderness Area. In 1979 ASARCO submitted a proposal to conduct preliminary exploratory drilling. The Forest Service began an extensive review of the proposal, including an environmental assessment, biological evaluation, and biological opinion. The Forest Service approved the proposal and ASARCO drilled four holes between July and November of that year. On February 4, 1980 ASARCO submitted a proposal for the continuation of the 1979 exploration program to be conducted during 1980–1983. For 1980, 36 drill

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The plaintiffs as named in the complaint were Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears, Western Sanders County Involved Citizens, Defenders of Wildlife, Sierra Club, and Cesar Hernandez.

2. ASARCO, Inc. is a mining company.

holes on 22 sites in the Chicago Peak area of the Wilderness were proposed with a similar level of activity expected to take place in each of the three succeeding years. The purpose of the drilling program is to assess the extent of copper and silver deposits in the area. Each drill site is limited to an area of 20 feet by 20 feet. Over a four-year period these sites will occupy a combined area of about one-half acre. Pursuant to 36 C.F.R. § 252.4(f) (1981), the Forest Service prepared an environmental assessment of the proposal, referred to as the Chicago Peak Mining Exploration Project. Copies of the assessment were sent to various individuals for comment and five public meetings were held. In accordance with section 7(c) of the ESA, 16 U.S.C. § 1536(c) (Supp. IV 1980), the Forest Service prepared a biological evaluation, assessing potential effects of the proposal on the grizzly bears. It concluded that the cumulative impact of the drilling together with other activities in the Cabinet Mountains Wilderness Area, such as timber sales, could adversely affect the bears. Therefore fourteen specific recommendations were made which were designed to reduce these potential effects to a minimum. To offset the adverse effects of the drilling activities the evaluation suggested the adoption of compensatory measures which would positively influence grizzly habitat.

Pursuant to section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2) (Supp. IV 1980), the Forest Service initiated formal consultation with the Fish and Wildlife Service of the Department of Interior (FWS). In compliance with section 7(b) of the ESA, 16 U.S.C. § 1536(b) (Supp. IV 1980) the FWS prepared a biological opinion detailing the effects of the ASARCO Chicago Peak project on the grizzlies and suggesting alternatives. This biological opinion was submitted to the Forest Service on June 19, 1980 and stated that the ASARCO proposal was "likely to jeopardize the continued existence of the grizzly bear." The principal factors underlying this conclusion were:

1. The current precarious status of the Cabinet Mountains grizzly bear population.

2. Impacts that exploration may have upon denning activities and hence reproductive success.

3. The level of current and proposed projects that will be occurring simultaneously with the exploration program, further removing the amount of habitat available to the grizzly.

(J.A. 175) The FWS outlined an alternative course of action which would avoid jeopardizing the continued existence of the Cabinet Mountains grizzly bear population. According to the FWS, the alternative was designed to "completely compensate in specific ways the cumulative adverse effects of the proposed project and other ongoing and proposed Forest Service activities." (J.A. 178) Three measures were described: (1) limiting ASARCO's proposed annual period of operation so that no drilling or helicopter flights occur after September 30 of each operating season. This was a month earlier than ASARCO proposed; (2) rescheduling or eliminating certain timber sales; and (3) ordering seasonal or permanent road closures so as to provide greater security for the grizzlies' habitat. (J.A. 178)

In May 1980 the Forest Service completed a final environmental assessment which incorporated the recommendations made by the FWS in its biological opinion. In addition the Forest Service recommended measures designed to mitigate the adverse effects on the Wilderness Area with particular regard to the grizzly bears, including a prohibition on overnight camping by ASARCO personnel except in emergency situations, daily and seasonal restrictions on helicopter flights to avoid disturbing the grizzlies during important denning and feeding periods, restrictions on helicopter usage to specified flight corridors, reclamation of drilling sites, seasonal restrictions on drilling activity in specified areas of the Wilderness, and monitoring of ASARCO's operations by Forest Service personnel. The plan devised by the FWS was expressly adopted by the Forest Service.

On June 17, 1980 the Kootenai National Forest Supervisor, William E. Morden, is-

sued a "Decision Notice and Finding of No Significant Impact" which approved the ASARCO plan subject to the modifications contained in the environmental assessment and the complete compensation plan described in the FWS's biological opinion. Morden concluded that the impacts of the proposed activity had been adequately assessed and appropriate measures initiated to ensure that "[t]he continued existence of the grizzly bear is not threatened nor is its critical habitat adversely modified." (J.A. 47) Because the environmental assessment found there would be no significant impacts from the proposal as modified, Morden stated that an environmental impact statement (EIS) was unnecessary. Approval was expressly limited to the proposed exploratory drilling activities; further activities such as developmental exploration or mineral extraction would require a comprehensive examination of environmental effects.

After an unsuccessful administrative appeal of the decision plaintiffs began this action in the District Court. The plaintiffs averred that the Forest Service had violated its responsibilities under section 7 of the ESA, which provides, "[e]ach Federal agency shall ... insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species ...." 16 U.S.C. § 1536(a)(2) (Supp. IV 1980). The plaintiffs also argued that the agency's failure to prepare an EIS violated NEPA. On April 15, 1981 the district judge denied the plaintiffs' motion for summary judgment and granted the summary judgment motions of the Forest Service and ASARCO. The court first concluded that agency actions under the ESA are subject to the arbitrary and capricious standard of review, rather than de novo review, 510 F.Supp. at 1189. It then held that the Forest Service had met its burden under both NEPA and the ESA by showing that its decision was not arbitrary or capricious. Id. The court emphasized that the Forest Service had imposed mitigation measures and taken affirmative steps to ensure that the grizzly bears would be protected. Id. at 1190. Also the court noted that only exploratory drilling had been approved and that more extensive activities would require further environmental studies and approval. Id.

Two issues are presented for review: first, whether the agency erred by failing to prepare an EIS, second, whether the agency's decision to permit the drilling program violated the ESA.

Appellants contend that the Forest Service violated NEPA by failing to prepare an EIS. NEPA requires that an EIS be prepared for major federal actions "significantly affecting the quality of the human environment ..." 42 U.S.C. § 4332(2)(C) (1976). Under the statute the administrative agency has the "initial and primary responsibility" to ascertain whether an EIS is required and its decision can be overturned only if it was arbitrary, capricious or an abuse of discretion. *Committee for Auto Responsibility v. Solomon*, 195 U.S. App.D.C. 410, 420, 603 F.2d 992, 1002 (1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980).

Both the Forest Service and the FWS concluded that the ASARCO proposal could have an adverse impact upon the grizzly bears, particularly when other concurrent activities in the Cabinet Mountains area were taken into account. Numerous specific recommendations were made to avoid this impact and mitigation measures to protect the grizzly bears were imposed upon the proposal. As we have said these measures were designed to "completely compensate" both the adverse effects of the ASARCO proposal and the cumulative effects of other activities on the bears and their habitat. In light of the imposition of these measures, the Forest Service concluded that implementation of the ASARCO proposal would not result in "any significant effects upon the quality of the human environment." (J.A. 48) Therefore an EIS was found to be unnecessary.

This court has established four criteria for reviewing an agency's decision to

forego preparation of an EIS: (1) whether the agency took a "hard look" at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum. *Maryland-National Capital Park and Planning Comm'n v. United States Postal Service*, 159 U.S. App.D.C. 158, 169, 487 F.2d 1029, 1040 (1973). The fourth criterion permits consideration of any mitigation measures that the agency imposed on the proposal. As this court noted, "changes in the project are not legally adequate to avoid an impact statement *unless they permit a determination that such impact as remains, after the change, is not 'significant.'*" *Id.* (emphasis supplied) Other courts have also permitted the effect of mitigation measures to be considered in determining whether preparation of an EIS is necessary. *See, e.g., Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir. 1982); *City & County of San Francisco v. United States*, 615 F.2d 498, 501 (9th Cir. 1980); *Sierra Club v. Alexander*, 484 F.Supp. 455, 468 (N.D.N.Y.), aff'd mem., 633 F.2d 206 (2d Cir. 1980). Logic also supports this result. NEPA's EIS requirement is governed by the rule of reason, *Committee for Auto Responsibility v. Solomon*, 195 U.S.App.D.C. at 421, 603 F.2d at 1003 (1979), and an EIS must be prepared only when significant environmental impacts will occur as a result of the proposed action. If, however, the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required. To require an EIS in such circumstances would trivialize NEPA and would "diminish its utility in providing useful environmental analysis for major federal actions that truly affect the environment." *Id.*

The appellants rely on a recent statement by the Council on Environmental Quality (CEQ) concerning the effect of mitigation measures on NEPA's EIS requirement. In a publication entitled "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations", 46 Fed. Reg. 18,026 (1981), the CEQ said:

> Mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement.

*Id.* at 18,038. Because the mitigation measures adopted in the present case were not part of the original proposal and were not imposed by statute or regulation, appellants contend they can not be used to justify the Forest Service's failure to prepare an EIS.

We think the appellants' reliance on the CEQ statement is misplaced. The CEQ is charged with administering NEPA and its interpretations are generally entitled to substantial deference, *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979), but such deference is neither required nor appropriate here. The NEPA regulations issued by the CEQ are binding on all federal agencies. Exec. Order 11,991, 3 C.F.R. 123, 124 (1978). The "Forty Questions" publication, however, is merely an informal statement, not a regulation, and we do not find it to be persuasive authority. *See General Electric Co. v. Gilbert*, 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–411, 50 L.Ed.2d 343 (1976). Unlike the regulations considered in the *Andrus* case, it was not the product of notice and comment procedures and does not impose a mandatory obligation on all federal agencies. Although the introduction to the memorandum states that it does not impose any additional requirements beyond those contained in the NEPA regulations, 46 Fed. Reg. at 18,026, the answer relied on by

appellants is "not at all evident from the underlying regulations." *Cabinet Mountains Wilderness v. Peterson*, 510 F.Supp. at 1190 n.4. The sections cited by the CEQ, 40 C.F.R. §§ 1508.8 and 1508.27 (1981), construe the terms "effects" and "significantly" broadly but do not discuss the appropriateness of mitigation measures. Moreover, the CEQ published the "Forty Questions" on March 23, 1981, approximately nine months after the Forest Service approved ASARCO's exploratory drilling program. Fairness would require that it not be accorded binding retroactive effect.

■ Because the mitigation measures were properly taken into consideration by the agency, we have no difficulty in concluding that the Forest Service's decision that an EIS was unnecessary was not arbitrary or capricious. The record indicates that the Forest Service carefully considered the ASARCO proposal, was well informed on the problems presented, identified the relevant areas of environmental concern, and weighed the likely impacts.

When ASARCO submitted its four-year drilling proposal the agency prepared an environmental assessment, copies were circulated for comment, and public meetings were held. An extensive biological evaluation was conducted which concluded the proposed drilling could potentially affect the grizzly bears in two ways: habitat modification and increased human-bear interactions, including direct encounters and reductions in secure habitat due to human disturbances. The evaluation also pointed out that the cumulative effects of the proposal and other concurrent activities might be significantly greater than the effects of the drilling proposal considered by itself. *Id.* As to habitat modification, the evaluation concluded the adverse effect would be insignificant. *Id.* The total area involved in the drilling was estimated to be less than one-half acre and even this estimate was considered high because the drill sites could be reclaimed. The more serious threat was posed by the loss of secure habitat due to increased human activities in the area, particularly the disturbance of important den-

ning and feeding sites. Timber sales and recreational activities were specifically referred to. *Id.* To reduce such potential adverse effects to a minimum, fourteen recommendations were made, including completion of project activities by October 31 of each year, restrictions of helicopter flights to specified corridors, measures to reduce helicopter noise, seasonal restrictions on the use of helicopters in particular areas, prohibition of project activities in the Copper Gulch area after July 31 in order to protect potentially important late summer and early fall food sources, daily restrictions on helicopter flights during important feeding periods, monitoring of the project by a biological technician, closure of various roads to protect the bears during feeding periods and to enhance their security, prohibiting the carrying of firearms by ASARCO personnel, prohibiting overnight camping by project personnel except in emergency situations, and daily removal of food wrappers, containers and excess food.

The Forest Service also initiated formal consultation with the FWS. In its biological opinion the FWS expressed concern over the cumulative effects of human activities in the area and agreed that displacement of the bears from secure habitats was the most serious impact of the proposal. Although the FWS concluded that the drilling program was likely to jeopardize the bears, it set forth a number of measures which were designed to avoid this result. To reduce adverse effects to a minimum the FWS stated that restrictions set forth in the biological evaluation prepared by the Forest Service must be strictly adhered to. Because the Chicago Peak area is a potentially important denning area, the FWS recommended that September 30, rather than October 31, should be the annual termination date for drilling activities. In assessing the cumulative effects of activities in the area, the FWS used a 10-mile travel radius for the bears to determine which other activities were relevant. This estimated travel radius was based on several expert studies of grizzly bears' home range. Using this method the FWS determined that certain timber sales and roads were relevant in

addressing the problem of cumulative effects. Therefore, in addition to modifying ASARCO's period of operations, the FWS recommended rescheduling or eliminating certain timber sales and implementing specified road closures to provide a more secure habitat for the bears. According to the FWS, this course of action would "completely compensate in specific ways the cumulative adverse effects of the proposed project and other ongoing and proposed Forest Service activities" and would "avoid jeopardizing the continued existence of the grizzly bear". (J.A. 178) The Forest Service's final environmental assessment incorporated the recommendations made in the biological evaluation and biological opinion and expressly adopted the complete compensation plan devised by the FWS.

Appellants have not demonstrated any deficiencies in the agency's decision making process. They allege that the agency did not address the issue of cumulative impacts, that the effectiveness of the mitigation measures is not factually supported, and that the measures are too vague to be enforced. All these contentions are without merit. As we have noted, the Forest Service carefully considered the cumulative effects of activities in the Cabinet Mountains area. This led to curtailment of timber sales and the closing of several roads. As to the factual basis of the agency's decision, the Forest Service and the FWS conducted a comprehensive evaluation of the proposal. Wildlife biologists were consulted and expert studies were referred to. For each identified area of concern, one or more measures were implemented to mitigate potential adverse environmental effects.

Appellants mistakenly claim that the Forest Service relied on an estimated three percent reduction in grizzly bears' habitat resulting from the drilling proposal but that the FWS estimated the potential reduction to be thirty percent. The thirty percent figure, however, was given by a state game agency, rather than the FWS. Letter from Fletcher E. Newby, Deputy Director, Montana Department of Fish and Game, to William Morden, Supervisor, Kootenai National Forest (May 18, 1980). (J.A. 188) More-over, the thirty percent estimate is based on cumulative effects and not on ASARCO's drilling activities alone. *Id.* at 2. The Forest Service adequately addressed these cumulative effects and imposed compensation measures because of them.

Finally, we perceive no difficulty in reading the project modifications as requiring compliance by ASARCO. The Forest Service approved the proposal subject to the restrictions and mitigation measures which had been devised during the review process. Failure to abide by the modifications would be contrary to terms of the approval. If necessary, the agency can redress any violations by revoking or suspending its permission to conduct the drilling program.

We conclude that the agency's decision not to prepare an EIS was reasonable and adequately supported. Courts cannot substitute their judgment for that of an agency if the agency's decision was "fully informed and well considered." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Thus, the decision as to whether an EIS should be prepared is left to the agency's informed discretion. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976). Here the agency conducted a thorough analysis of the proposed action and imposed specific measures to address the relevant areas of environmental concern. The agency concluded the proposal as modified would not cause any significant environmental impacts. Appellants have not identified any deficiencies in the agency's decision. For us to overturn it under these circumstances would require an unjustifiable intrusion into the administrative process. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. at 556, 98 S.Ct. at 1218. We refuse to intrude.

For similar reasons we find that the Forest Service's decision to approve ASARCO's drilling project did not violate the ESA. Appellants however contend the District Court erred by refusing to conduct *de novo* review of the Forest Service's action, and

by finding instead that the arbitrary and capricious standard was appropriate. 510 F.Supp. at 1189. They argue that Congress mandated *de novo* review under the ESA by including a provision for citizen suits and that the congressional intent to protect endangered species of plants and animals further supports this view. Appellants also attempt to analogize this situation to other statutes under which *de novo* review has been found to be required. We find these arguments unpersuasive.

■■■ The applicability of *de novo* review to administrative actions is limited and is generally not presumed in the absence of statutory language or legislative intent to the contrary. In *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963), the Supreme Court stated, "in cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, this Court has held that consideration is to be confined to the administrative record and that no *de novo* proceeding may be held." *Id.* at 715, 83 S.Ct. at 1413. *See also Consolo v. FMC*, 383 U.S. 607, 619 n.17, 86 S.Ct. 1018, 1026 n.17, 16 L.Ed.2d 131 (1966). Referring to this rule this court has said:

This circumscription . . . stems from well ingrained characteristics of the administrative process. The administrative function is statutorily committed to the agency, not the judiciary. A reviewing court is not to supplant the agency on the administrative aspects of the litigation. Rather, the judicial function is fundamentally—and exclusively—an inquiry into the legality and reasonableness of the agency's action, matters to be determined solely on the basis upon which the action was administratively projected.

*Doraiswamy v. Secretary of Labor*, 180 U.S. App.D.C. 360, 367–68, 555 F.2d 832, 839–40 (1976). (footnotes omitted) Appellants in effect seek to have the trial court "substitute its views regarding environmental impacts" for those of the agencies which are charged with implementing the ESA. 510 F.Supp. at 1189. The Act provides no support for such a sweeping result. The citizen suit provision of the Act, relied on by appellants, merely provides a right of action to challenge the agency action alleged to be in violation of the Act or to compel agency compliance with the requirements of the Act.[3] It does not direct trial courts to conduct *de novo* review in adjudicating such actions and we decline to read such a requirement into the Act.

Since the ESA does not specify a standard of review, judicial review is governed by section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1976). *See* 5 B. Mezines, J. Stein and J. Gruff, Administrative Law § 43.02[6], at 43–32 (1982). Although the APA contains a *de novo* review provision, 5 U.S.C. § 706(2)(F), its applicability is strictly limited to two circumstances, neither of which is found in the present case:

First, such *de novo* review is authorized when the action is adjudicatory in nature and the agency factfinding procedures are inadequate. And, there may be independent judicial factfinding when issues

---

**3.** The citizen suit provision states in relevant part:

(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

(A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

(B) to compel the Secretary to apply, pursuant to section 1535(g)(2)(B)(ii) of this title, the prohibitions set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title with respect to the taking of any resident endangered species or threatened species within any State.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence.

16 U.S.C. § 1540(g)(1) (1976).

that were not before the agency are raised in a proceeding to enforce nonadjudicatory agency action.

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (citation omitted). *See also Camp v. Pitts,* 411 U.S. 138, 141–42, 93 S.Ct. 1241, 1243–1244, 36 L.Ed.2d 106 (1973) (*per curiam*). We conclude therefore that the appropriate standard of review under the ESA is the arbitrary and capricious standard provided by the APA. 5 U.S.C. § 706(2)(A) (1976).

Our conclusion is consistent with prior decisions of this court and other courts. Although we have not previously ruled on the question of the applicable standard of review under the ESA, we recently decided a case arising under the Act in accordance with the arbitrary and capricious standard. In *North Slope Borough v. Andrus,* 206 U.S.App.D.C. 184, 642 F.2d 589 (1980), we reviewed action of the Secretary of the Interior pertaining to an endangered species of whales and concluded:

> There is ample evidence that the Secretary was meaningfully alerted to the biological consideration attaching to Bowhead whales in the Beaufort Sea. The Secretary could reasonably conclude that the lease sale did not endanger the whales. For these reasons, the substantive prescription of section 7(a)(2) to preserve endangered life has been honored.

*Id.* at 204, 642 F.2d at 609. Other courts that have addressed this issue have held that agency action challenged pursuant to the ESA is subject to the arbitrary and capricious standard of review. In *National Wildlife Federation v. Coleman,* 529 F.2d 359 (5th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976), the court said:

> [A]fter consulting with the Secretary the federal agency involved must determine whether it has taken all necessary action to insure that its actions will not jeopardize the continued existence of an endangered species or destroy or modify habitat critical to the existence of the species. Once that decision is made it is then

subject to judicial review to ascertain whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153. *See* Title 16, U.S.C., Section 1540(g).

529 F.2d at 371–72. (footnote omitted) *See also Hill v. Tennessee Valley Authority,* 549 F.2d 1064, 1074 n.21 (6th Cir. 1978), *aff'd on other grounds,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *Sierra Club v. Froehlke,* 534 F.2d 1289, 1304–05 (8th Cir. 1976); *Cayman Turtle Farm, Ltd. v. Andrus,* 478 F.Supp. 125, 131 (D.D.C. 1979), *aff'd mem.,* No. 79–2031 (D.C.Cir. Dec. 12, 1980).

In support of their contention that the ESA requires *de novo* review of agency action appellants cite several cases which have found such review to be appropriate under other statutes. The appellants rely principally on cases arising under the employment discrimination laws, especially *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), in which the Supreme Court held that federal employees have the same right to trial *de novo* of their employment discrimination claims as private sector employees under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1976). Appellants erroneously contend that the *Chandler* case is precisely analogous with the case here. In the *Chandler* case, the Supreme Court found that in both the plain language of the statute and the legislative history Congress had clearly expressed its intent that *de novo* review be available. 425 U.S. at 862, 96 S.Ct. at 1960. The Court noted that "[t]he terminology employed by Congress— 'assign the case for hearing', 'scheduled . . . for trial', 'finds'—indicates clearly that the 'civil action' to which private-sector employees are entitled under the amended version of Title VII is to be a trial *de novo.*" *Id.* at 845, 96 S.Ct. at 1952. The Court also found that "[t]he legislative history of the 1972 amendments reinforces the plain meaning of the statute and confirms that Congress intended to accord federal employees the

same right to a trial *de novo* as is enjoyed by private-sector employees ..." *Id.* at 848, 96 S.Ct. at 1953. Thus, the Court held the case before it was distinguishable from earlier decisions which held *de novo* review was generally not presumed. *Id.* at 861–62, 96 S.Ct. at 1959–60. Here, by contrast, Congress has not expressed an intent that judicial review should be *de novo*. Therefore *Chandler v. Roudebush* and the similar cases cited by appellants lend no support to their contention.

■ Applying the arbitrary and capricious standard to the circumstances of this case, we hold that the Forest Service's action was reasonable and supported by the record. The ESA requires federal agencies to ensure that any actions taken by them are "not likely to jeopardize the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2) (Supp. IV 1980). Sufficient evidence exists to support the Forest Service's decision that the ASARCO proposal, as modified, will not endanger the Cabinet Mountains grizzly bear population. Our conclusion is based on the same factors which led us to conclude that the agency's decision regarding the EIS was not arbitrary or capricious. The agency imposed modifications on the ASARCO proposal to mitigate the perceived potential threats to the grizzly bears and adopted a compensation plan designed to offset the adverse effects of the drilling operations. Taking into consideration the imposition of these measures, the Forest Service reasonably concluded that the project would not jeopardize the continued existence of the grizzly bears.

We emphasize that our review of the agency's action is limited to the approval of the four-year exploratory drilling proposal. Similarly, the Forest Service and the FWS expressly limited their findings to the drilling program presented by ASARCO, which is minor in scope and temporary in nature. Any future proposals by ASARCO to conduct drilling activities in the Cabinet Mountains area will require further scrutiny under NEPA and the ESA.

We conclude therefore that the Forest Service's findings that an EIS was unnecessary and that the existence of the Cabinet Mountain grizzly bears was not likely to be jeopardized by the ASARCO drilling project were not arbitrary or capricious. Accordingly, the order of the District Court is

*Affirmed.*