### FRIENDS OF ENDANGERED SPECIES, INC., Plaintiff,

v.

Robert A. JANTZEN, Director, United States Fish and Wildlife Service; County of San Mateo; City of Daly City; City of Brisbane City of South San Francisco; Visitacion Associates; W.W. Dean and Associates, Inc.; Presely of Northern California, Inc.; Cadillac-Fairview Homes West, Inc.; Foxhall Investment, Ltd.; Defendants.

No. C–83–3837 SW.

United States District Court,
N.D. California.

March 15, 1984.

As Modified March 20, 1984.

Albert E. Polonsky, City Atty., City of Daly City—Daly City, Cal., for defendant, City of Daly City.

Michael Freund, Albany, Cal., for plaintiff.

James P. Fox, Dist. Atty. by David J. Byers, Deputy Dist. Atty., Redwood City, Cal., for defendant County of San Mateo.

Irell & Manella, George T. Caplan, Los Angeles, Cal., for defendant Cadillac Fairview Homes West—California.

Howard N. Ellman, John D. Hoffman, Kenneth N. Burns, Ellman, Burke & Cassidy, San Francisco, Cal., for defendant Visitacion Associates.

Robert K. Rogers, Jr. City Atty., Elladene Lee Katz, Asst. City Atty., South San Francisco, Cal., for defendants.

Jessica S. Pers, Michael J. Coffino, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant W.W. Dean & Associates.

George J. Silvestri, Jr., Bagshaw, Martinelli, Corrigan & Jordan, San Rafael, Cal., for defendant City of Brisbane.

Charles E. Chase, Burlingame, Cal., for defendant, Foxhall Inv., Ltd.

Joseph J. Cook II, Mark A. Cameron, Miller, Starr & Regalia, Oakland, Cal., for Presley of Northern California, Inc.

Joseph P. Russoniello, U.S. Atty., Rodney H. Hamblin, Asst. U.S. Atty., Chief, Land and Natural Resources Division, Charles M. O'Connor, Asst. U.S. Atty., San Francisco, Cal., Dianne H. Kelly, Atty., U.S. Dept. of Justice, Washington, D.C., for Federal defendant.

## ORDER AND MEMORANDUM OF LAW GRANTING MOTION FOR SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

Defendants brought a motion for summary judgment pursuant to Fed.R.Civ.Pro. 56 noticed for February 8, 1984. Because of a misunderstanding with regard to the scheduling of defendants' motion for summary judgment, plaintiff arrived late for oral argument. Rather than reschedule hearing, or grant defendant's motion, we invited both parties to supplement their briefs with any additional facts and legal arguments they might have intended to raise at oral argument. Both parties have now done so. The parties have not, in our opinion, presented arguments significantly different from those presented in the first series of papers submitted.

Plaintiff has responded to defendants' motion by repeating the various claims it made previously, when seeking a TRO and a preliminary injunction. It contends that the issuance of the permit challenged herein was a violation of the Endangered Species Act (ESA), 16 U.S.C. § 1531, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321. Plaintiff claims that the survival of certain species of butterflies (the Mission Blue and the San Francisco Checkerspot, among others) will be threatened by the development which defendants propose. In support of this position, plaintiff submits the declarations of two experts in entomology, who challenge the methodology of the biological study upon which the permit was issued. Plaintiff claims that these declarations raise genuine issues of material fact regarding the validity of the permit, foreclosing the entry of summary judgment for defendants.

Having reviewed the memoranda, affidavits, and other papers submitted by the parties, we conclude that the plaintiff has not produced any material facts precluding the summary judgment motion of the defendants. Therefore, IT IS HEREBY ORDERED that the defendants' motion for summary judgment is GRANTED. FACTS:

San Bruno Mountain is 3500 acres of undeveloped land on the San Francisco Peninsula. It is an area rich in wildlife, including several endangered species of Lepidoptera. It is also an area attractive to developers, given its close proximity to the urban centers of San Francisco and San Jose. The conflict of these two competing interests has brought the case to us.

Our involvement in the case is recent, however, when compared to that of the parties. Throughout the early 1970's, defendant Visitacion Associates and the Crocker Land Company, a co-owner of Visitacion, purchased land on the Mountain in hopes of capitalizing on its location. By 1975, these defendants owned virtually all

of the Mountain. They then approached the municipal and county defendants with a proposal to develop large areas of San Bruno Mountain.

A citizens' group, the Committee to Save San Bruno Mountain, formed to oppose the development In response to this controversy, the San Mateo County Board of Supervisors passed the San Bruno General Plan Amendment (Amendment) in 1976.

By 1980, litigation between Visitacion Associates and the County over the Amendment reached a mutually satisfactory solution. As a result of the settlement, Visitacion and the Crocker Land Co. sold or donated over 2000 acres on the Mountain to the county and State for parkland. Thus, about one-third of the Mountain was designated for development, while two-thirds was dedicated to parks.

Soon after the final conveyances of the property, the plot thickened as a result of federal action pertaining to the wildlife present on the mountain. On March 28, 1980, the Fish and Wildlife Service (FWS) issued a re-proposal to list the Callippe Silverspot Butterfly, found in some numbers on the Mountain, as an endangered species, and to designate its critical habitat pursuant to Section 4 of the Endangered Species Act, 16 U.S.C. § 1533. The newly proposed critical habitat overlapped most of the area on the Mountain which had been reserved for development.

Nearly simultaneously, the Mission Blue Butterfly, which was already on the endangered species list, was found to inhabit some of the area to be developed. (Later in 1980, FWS allowed the proposal to list the Callippe Silverspot to expire, leaving the Mission Blue at the center of the current litigation. Two other endangered species, the San Bruno Elfin Butterfly and the San Francisco Garter Snake, also have habitat on the Mountain, but are not found in significant numbers in the areas to be developed.)

In order to adequately safeguard the endangered species, while fulfilling promised development opportunities, the San Bruno Mountain Steering Committee was formed in May of 1980. It was ultimately made up of representatives of San Mateo County, the three cities involved, prospective developers, FWS, the California Department of Fish and Game, and the Committee to Save San Bruno Mountain.

The Steering Committee initiated a two-year Biological Study of the Mission Blue and Callippe Silverspot butterflies to determine their populationand distribution on the Mountain, and to determine whether development would conflict with the continued existence of the species. Although the Mission Blue and Callippe Silverspot were the focus of the study, it also gave consideration to several other species not listed as endangered. The County selected and hired Thomas Reid Associates to conduct this study when the butterfly situation had first come to light.

The study concluded that the butterflies inhabited most of the grassland portions of the Mountain, including those areas slated for development. It also concluded that, if development did not occur, the species would be threatened through natural forces by the loss of its grassland habitat to encroaching brush, noxious to the butterflies.[1]

In October of 1981, the Steering Committee began developing a Habitat Conservation Plan (HCP) based on the study. The final HCP, completed in November, 1982, was incorporated into an implementing document called the "Agreement with Respect to the San Bruno Mountain Area Habitat

---

**1.** The presence of this scientific data and the independent review thereof makes a "worst case analysis" (WCA) unnecessary. Such an analysis is necessary in all cases where significant impacts were not studied by the agency in question, or where complete scientific data concerning the impacts of a proposed action is unavailable for any reason, including the cost of obtaining such data. 40 C.F.R. § 1502.22; *Save Our Ecosystems v. Clark,* Nos. 83–3908, 83–3918, 83–3887, and 83–3916 (9th Cir. Jan. 27, 1984). Here, complete scientific data was available to the agency, which studied all significant impacts of the action challenged by the plaintiff.

Conservation Plan" (the Agreement). The Agreement was executed by the County, the cities, the major landowners and developers involved on the Mountain, the California Department of Fish and Game, and the California Department of Parks and Recreation.

The Agreement dedicated 793 privately owned acres as open space, preserved 81% of the open space on the Mountain as undisturbed habitat, with another 3% to be restored after temporary disturbance during construction, and required contribution of $60,000 annually, adjusted for inflation, by lot owners on the Mountain to finance a permanent habitat conservation program. The County agreed to supervise the program through a conservation manager and an advisory committee of scientists. According to the HCP, 14% of the population of the Mission Blue on the Mountain would be disturbed by the development.

Notwithstanding the Agreement and HCP, the ESA required FWS to issue a permit pursuant to Section 10(a) of the Act, 16 U.S.C. § 1539. As a prerequisite to the issuance of this permit, the FWS was required to conduct an inter-agency consultation and issue a Biological Opinion certifying that the permit was not likely to jeopardize the continued existence of the endangered species.

Also, NEPA required an Environmental Assessment (EA) to determine whether the permit would have significant adverse environmental consequences; if so, a full blown Environmental Impact Statement (EIS) would be necessary.

To that end, the FWS made the EIR/EA public for hearing and comment in November of 1982. Some adverse comments were received by the FWS during the comment period; these were considered and answered at length by the FWS in its permit findings and EIR/EA. In addition, three scientists of national reputation commented favorably on the report. Some three months after the close of the comment period, the FWS received more criticisms of its Biological Study. It considered these comments at length in its permit findings,

although under no strict legal duty to do so.

After these public hearing and opportunities for written comment pursuant to the regulatory scheme, FWS issued a Biological Opinion on March 4, 1983, concluding that no jeopardy to the continued existence of the species would result from planned development under the permit. It also issued a final Finding of No Significant Impact (FONSI), based on a joint EIR/EA which had been prepared cooperatively by FWS and the State, pursuant to state and federal regulations. The FONSI permitted waiver of a full blown EIS. Finally, FWS issued the Section 10(a) permit on the same date.

The permit was conditioned upon the implementation of the Agreement and the HCP. It allows incidental taking of the Mission Blue on the Mountain, but prohibits the taking of the San Francisco garter snake and the San Bruno Elfin Butterfly within their designated habitat, unless an amendment to the permit is granted.

Previously, plaintiff Friends of Endangered Species, a citizen's group descended from the Committee to Save San Bruno Mountain, has moved this court for both a TRO and a preliminary injunction. In those actions, plaintiffs' claims were essentially those presented here. Both motions were denied.

### A. The Standard of Review

■ In order to survive a motion for summary judgment, plaintiff must raise a genuine issue as to a material fact which requires a trial for resolution. Fed.R.Civ. Proc., Rule 56. This rule is complicated by our role as a court of review with regard to the administrative decisions challenged here.

In this situation, we sit only to ensure that the prior administrative decisions were not "clear errors of judgment," made "arbitrarily or capriciously." 5 U.S.C. § 706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Thus, unless plaintiff can produce evidence which raises a viable

issue as to whether the agency in question (the FWS) acted in an arbitrary and capricious manner (thereby causing a clear error of judgment), defendants' motion must be granted.

Moreover, as a general rule, the courts have considered cases like the present one to be well suited to disposition on summary judgment, when based on a record as voluminous and complete as that presented to us. *Upper West Fork River Watershed Ass'n v. Corps of Engineers*, 414 F.Supp. 908 (N.D.W.Va.1976); *affd. without opinion* 556 F.2d 576 (4th Cir.1977); *Hart and Miller, etc. v. Corps of Engineers*, 505 F.Supp. 732, 754, 755 (D.Md.1980). This is so because the goal of NEPA is simply to ensure "a fully informed and well considered decision" on the part of the agency challenged. *Vermont Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Our role is not to substitute our discretion for that of the agency, but merely to check its compliance with the regulations of NEPA and ESA. *Scenic Hudson Preservation Conference v. FPC*, 453 F.2d 463, 468 (2d Cir.1971); *Life of the Land v. Brinegar*, 485 F.2d 460, 469 (9th Cir.1973).

*B. Plaintiff's Claims*

Plaintiff argues that NEPA has been violated in the following ways: (1) by failing to prepare an EIS, the FWS acted capriciously and irresponsibly; (2) the FWS unlawfully delegated its responsibility under NEPA by having environmental studies performed by a private and possibly biased consultant; and (3) the study on which the agency relied was methodologically flawed, causing the agency to act capriciously. In addition, plaintiff urges that the agency violated the Endangered Species Act in two ways: (1) by failing to disclose the environmental impact of the HCP on species under petition for listing under the ESA; and (2) by basing its conclusions on a methodologically flawed study.

*1. The NEPA Claims*

■ Plaintiff's attempt to raise an issue of material fact with regard to the FWS' failure to prepare a full-blown EIS is without merit. It maintains that the FONSI issued herein constituted an insufficient consideration of the environmental issues and impacts resulting from the proposed development. In making this claim, plaintiff relies primarily on its methodological criticisms of the EIR/EA prepared by the FWS and State. Essentially, plaintiff maintains that the questions it has regarding the scientific validity of the EIR/EA raise a material issue as to the FWS' duty to act responsibly.

We cannot accept such an argument. The agency here made every effort to consider criticisms of its Biological Study during the public comment period, and even considered many criticisms offered in an untimely fashion, incorporating them into its Permit Findings, and final HCP.

The Ninth Circuit has held that where the initial plans for a project indicate adverse environmental impacts, modifications to the original plans in the form of requiring mitigating measures may eliminate the need for a full-blown EIS. *Preservation Coalition v. Pierce*, 667 F.2d 851 (9th Cir. 1982) (Upholding a FONSI as reasonable). The facts of the case before us fit comfortably into this rule. Here, the FWS made every effort to conform its issuance of the HCP to the needs of the environment.

Further, NEPA does not require that this court decide whether or not the EIR issued herein was based on the best science available, nor does it require us to resolve the disagreements among various scientists as to methodology. *Hart and Miller Islands, supra*, at 755; *Mountains Wilderness v. Peterson*, 510 F.Supp. 1186, 1190–91 (D.D.C.1981), *affirmed* 685 F.2d 678 (D.C.Cir.1982). Our task is simply to ensure that the procedure followed by the FWS resulted in a reasoned analysis of the evidence before it, and that the FWS made this evidence available to all concerned. *Life of the Land v. Brinegar*, supra, at 472; *Save Lake Washington v. Frank*, 641 F.2d 1330, 1337 (9th Cir.1981).

■ Plaintiff further argues that the FWS' delegation of much of the Biological

Study performed herein was an irresponsible act of "rubberstamping." The rule in such cases is that delegation to a private consultant is not a *per se* violation of NEPA. The plaintiff must show the agency actually disregarded its role by failing to review adequately the study it commissioned. *Westside Property Owners v. Schlesinger*, 415 F.Supp. 1298 (D.Ariz. 1976); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir.1974). Here, the FWS had two representatives on the Steering Committee which reviewed the Biological Study, each of whom had reviewed many such studies while employed by the FWS. In addition, the FWS received three favorable evaluations of the Study by the independent experts to whom it was submitted. Thus, we cannot find that defendant FWS was guilty of "rubberstamping" the Reid study.

■ Plaintiff's last argument under NEPA is simply that the EIS/EA and Biological Study prepared by the FWS is "fatally flawed" in a scientific sense. As noted above, it is generally not the duty of this court to pass on the scientific merits of the decisions of the FWS. To succeed in such an argument, then, plaintiff's evidence would have to overwhelming enough to show that the FWS acted "arbitrarily or capriciously," 5 U.S.C. § 706, when it relied on the Biological Study to make its decision. The evidence presented here is not convincing enough to support such a conclusion. Ample evidence exists to show the Biological Study was competent, including the independent reviews noted above. Documents are sufficient under NEPA, if they

> provide decisionmakers with an environmental disclosure sufficiently detailed to aid in the substantive decision, and make available to the public information about the proposed project's environmental impact. *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974).

The documents at issue here are certainly credible enough to escape plaintiff's allegation that they did not adequately inform the public, and were so flawed as to deprive the agency of a reasoned choice.

### 2. Violation of the Endangered Species Act (ESA)

■ Plaintiff claims that the FWS violated sections 10(a) and 7(a)(2) of the Endangered Species Act, as amended in 1982. Section 10(a) allows the FWS to permit an otherwise prohibited "taking" of an endangered species if the taking is incidental to carrying out lawful activity. The section requires, however, that the applicant submit a comprehensive conservation plan. Before the FWS can issue a permit, it must scrutinize the plan and find that: (1) the taking will be incidental; (2) the applicant will minimize and mitigate the impacts of its action to the extent possible; (3) adequate funding will be ensured; and (4) the taking will not appreciably reduce the likelihood of survival of the species.

In this case, FWS found that the issuance of the permit would *enhance* the survival of the Mission Blue butterfly, because it would result in the conveyance of a substantial amount of critical habitat to public ownership; provide for regulation of 88% of the habitat; initiate a program which would alleviate the threatening encroachment of noxious brush; and ensure $60,000 of funding annually. *See* Section 10(a) Permit Findings, App. A., Item 33.

In order to raise a viable issue here, plaintiff must, as above, demonstrate that the FWS may have acted "arbitrarily or capriciously, [or] abused its discretion, or contravened the law." 5 U.S.C. § 706(2)(A).

Plaintiff attempts to show such an abuse in the agency's issuance of the 10(a) permit by repeating its attacks on the scientific methodology of the study on which the agency relied. For the reasons stated more fully above, plaintiff has not raised such an issue. Plaintiff may quibble with the science employed in the issuance of the permit, but this disagreement cannot, in light of the agency's care, raise an issue as to the agency's procedure in evaluating and reviewing the data before it.

Indeed, the ironic shortcoming of plaintiff's attack on the FWS' compliance with Section 10(a) is that the 1982 Amendment

to that section, which allowed the issuance of the permit for "incidental takings" upon an approved conservation plan was expressly based on the San Bruno Mountain situation. The HCP and the Agreement were extensively discussed in the legislative history of the Amendment. See H.R. Rep. No. 97–835, U.S.Code Cong. & Admin. News 1982, p. 2807, and Senate Rep. No. 97–418. The House Conference Report stated that "the adequacy of similar conservation plans [proposed as conditions for permits] should be measured against the San Bruno Plan." H.R.Rep. 97–835 (97th Cong., 2d Sess. 30–32 1982), U.S.Code Cong. & Admin.News 1982, p. 2872. The Senate report cites the HCP herein as an example of a case where the "over-all effect of a project can be beneficial to a species even though some incidental taking may occur." Senate Rep. No. 97–418 (97th Cong., 2d Sess.1982). Hence, we cannot find that the permit issued herein contravened section 10(a) of the ESA.

Plaintiff also attempts to raise a genuine issue with regard to section 7(a)(2) of the ESA, which imposes on the FWS a duty to "insure that any action authorized … is not likely to jeopardize the continued existence of any endangered species or result in the destruction or adverse modification of the species' critical habitat." 16 U.S.C. § 1536(a)(2).[2]

For the reasons stated fully above, this claim is groundless. The FWS has done everything feasible to protect the endangered species herein. Further, it had explained itself fully in its permit findings, and has expressly found that the proposed development will not threaten the continued existence of the endangered species plaintiff sues to protect. Indeed, the FWS expressly endorsed the finding in the Reid report that the proposed development may aid the survival of the endangered species herein, as it will prevent the encroachment of noxious brush in the critical habitat of the Mission Blue butterfly.

As an alternative to its § 7(a)(2) claim, plaintiff maintains that that NEPA requires a full disclosure of impacts as to the Tree Lupine Moth, and certain plant species, which are under petition for listing as endangered species under the ESA. Plaintiff bases this claim on § 7(a)(3) of the ESA, which requires federal agencies to minimize danger to species proposed for listing. 16 U.S.C. § 1536(a)(3). Minimizing the danger to the Tree Lupine Moth would require, according to plaintiff, a full disclosure of impacts under NEPA. This is, in a legal sense, plaintiff's best argument, and is approved in *Wilson, supra*, fn. 2, at 751. However, in light of the fact that the FWS appears to have considered the impact of the proposed development on these species in its § 10(a) Permit Findings, a full-blown EIS is not, in our opinion, mandated under NEPA. Further, the disposition of some 2000 acres of the mountain as a park may well enhance the possibility for survival of these species.

## CONCLUSION

The FWS' actions have reflected great concern for all species of wildlife on San Bruno Mountain. The FWS has, throughout, done everything it could to accommodate the adverse interests of man and the organisms that share his environment. No more is required by NEPA and ESA, though anything less is to be condemned. Therefore, defendants' motion for summary judgment is GRANTED.

---

2. Plaintiff has now conceded that the provision applies only to species presently listed as "endangered," in the wake of *Wilson v. Block*, 708

F.2d 735 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983).