*533 FISHER, Circuit Judge,
concurring in part and dissenting in part:
Prompted by this litigation, the U.S. Fish and Wildlife Service has attempted to minimize the effect of the Leavenworth National Fish Hatchery (“the Hatchery”) on the small population of bull trout in Icicle Creek. My colleagues in the majority find these efforts insufficient to meet the strictures of the Endangered Species Act (“ESA”) and place two substantial burdens on the Fish and Wildlife Service (“the Service”) that the ESA does not require. First, the majority requires the Service to address operations and maintenance on an unlimited time horizon, despite planned modifications that will further reduce the Hatchery’s impact on the bull trout. Second, the majority requires the Service to attribute continuation of a 70-year population decline to planned Hatchery operations, rather than recognizing that trend and the structures that caused it as the environmental baseline. I respectfully dissent from these aspects of the majority’s opinion.
I.
The majority first concludes that the Service acted arbitrarily or capriciously by limiting its analysis to the five-year term of the 2006 to 2011 Operations and Maintenance Plan (“the O&M Plan”). See Op. at 521-25. As the majority notes, Section 7 of the ESA requires consultation concerning any agency action that may “jeopardize the continued existence of an endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.” 16 U.S.C. § 1536(a)(2). The ESA defines agency action as “any action authorized, funded, or carried out by such agency.” Id. The applicable regulation further defines “action” as
all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to ... actions directly or indirectly causing modifications to the land, water, or air.
50 C.F.R. § 402.02.
Here the Service had a reasonable rationale to limit the scope of the agency action considered in the 2008 Biological Opinion to a five-year period: the projected completion of a new water intake system in 2011 that will reduce annual adverse impacts on the bull trout when completed. See U.S. Fish & Wildlife Serv., Biological Opinion for the Operation and Maintenance of the Leavenworth National Fish Hatchery Through 2011, at 14-15 (2008) (“2008 BiOp.”). As both the 2008 BiOp and the accompanying Incidental Take Statement (“ITS”) acknowledge, the current water intake system harms bull trout annually, and the majority recognizes that improving this system will require a new BiOp. See Op. at 519 n. 2. The Service also intends to undertake a broader habitat restoration project at the Hatchery. Although this project cannot begin until adequate funding has been secured and further consultation has occurred, see 2008 BiOp at 15, it demonstrates the significant differences between the environmental impacts during the period covered by the O&M Plan and future operations. Perhaps most importantly, allowing the Service in these circumstances to define an action as the multi-year operation of an ongoing program promotes renewed analysis based on a growing foundation of data, analysis and mitigation experiments. The majority’s contention that the Service “might as easily have chosen a thirty-year term or a one-year term,” Op. at 522, is unfairly dismissive of the agency’s reasonable response to the facts on the ground (and in the river).
*534 It seems quite reasonable for the Service to assess the present and future impacts of a fixed period of operations rather than to assess operations on an indefinite time horizon, which would require the demonstrably false assumption that the Service will never meaningfully change Hatchery operations. Cf. Pac. Coast Fed’n of Fishermen’s Ass’ns v. U.S. Bureau of Reclamation, 426 F.3d 1082, 1088-92 (9th Cir. 2005) (faulting a 10-year BiOp for failing to explain why mitigating action was delayed until year nine, not for being limited to 10 years). The majority’s repeated assertion that a BiOp addressing five years of operation and management is not a “ ‘comprehensive biological opinion[ ] considering all stages of the agency action,’ ” Op. at 524, 524-25 (quoting Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir.1988)), begs the question and fails to afford the Service appropriate flexibility to define the scope of its action. The majority guarantees that an ongoing program that fails to remedy immediately a slowly declining population will be found to jeopardize the existence of a threatened or endangered species.
A BiOp addressing a fixed term of operations can and must address long-term implications. However, ESA consultation need address only long-term effects of the agency action at issue, rather than additional agency actions that may or may not occur in the future. See 50 C.F.R. § 402.02 (defining “indirect effects” as “those that are caused by the proposed action and are later in time, but are still reasonably certain to occur” (emphasis added)); Nat’l Wildlife Fed’n v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 930 (9th Cir.2008) (“[T]he proper baseline analysis is ... what jeopardy might result from the agency’s proposed actions in the present and future human and natural contexts.” (internal quotation marks and citations omitted)). The 2008 BiOp expressly considered these “indirect effects.” 2008 BiOp at 67. Although the BiOp acknowledged that the proposed action is unlikely “to prevent the number of migratory spawners from being large enough to cause an increasing population trend, or to fully alleviate long-term genetic risks to the population,” id. at 85, given that the population has persisted for over 70 years without access to migratory spawners, it was not irrational for the Service to conclude that five additional years of limited access would not “reduce appreciably the likelihood of both the survival and recovery” of the local population, let alone the interim recovery unit. 50 C.F.R. § 402.02; cf. Am. Rivers v. U.S. Army Corps of Engrs., 271 F.Supp.2d 230, 254-55 (D.D.C. 2003) (finding that plaintiffs were likely to succeed on the merits because the Army Corps “narrowly focus[ed] its analysis on the impacts of the 2003 high summer flows on ... this year only, instead of evaluating both the present and future effects of the 2003 low summer flows ” (emphasis added)). Future BiOps may find that continued operation of the Hatchery will push the Icicle Creek population to a tipping point, but the 2008 BiOp provides a rational explanation why this particular O&M Plan will not appreciably increase the likelihood that such a point will be reached.
Rejecting appellant’s challenge to the 2008 BiOp would not, as the majority envisions, authorize death of the bull trout by a thousand cuts. A short-term BiOp is reasonable in this case because the Service plans major improvements in the near term that will significantly alleviate the bull trout take. Should the Service continue to resort to short-term BiOps in the future, however, that approach would be increasingly unlikely to satisfy the ESA, regardless of the justification. Allowing this short-term BiOp would not foreclose future analysis of any period of time in *535 which the agency’s action would reduce “appreciably the likelihood” of survival and recovery. Contra Op. 522-23 (emphasis in original). Indeed, a reasonable definition of an appreciable effect surely would include “a likely net decrease of five to ten bull trout over [a] five-year period”, id., when the starting population is believed to number fewer than 20 spawning individuals. See 2008 BiOp at 66. There is, however, no support in the record for the notion that such a decline is likely during the period addressed by the 2008 BiOp, let alone that the Service would continue to reach no-jeopardy conclusions if similar, cumulative decreases were to occur a second or third time.
Finally, the majority fears that the Service would permit serial reductions in the Icicle Creek population until its “role in the interim recovery unit [is] so diminished, that its loss could not be said to reduce appreciably the likelihood of survival and recovery of the interim recovery unit.” Op. 523 (emphasis in original). But, if the small Icicle Creek population plays a significant role, that importance must be based on genetic and geographic diversity, not the population’s contribution to gross numbers. Even if one or more short-term assessments permitted small further reductions in the Icicle Creek population, its genetic and geographic importance to the interim recovery unit would remain unchanged, and the loss of this diversity would have to be taken into account in future jeopardy assessments.
The majority tries to shoehorn this case into the rule we established in Conner v. Burford, 848 F.2d 1441(9th Cir.1988). See Op. at 521-22. Conner is not on point. There we held that an incremental approach to a BiOp was not permissible when the scope of the planned agency action — a lease of federal land for oil exploration, development and production— included activity beyond the exploration phase reviewed in the BiOp. See id. at 1443-44, 1452. Unlike Conner, the O&M Plan does not authorize activity beyond the duration or scope of the BiOp; the purpose of the planned activities is complete at the end of the authorized agency action. Cf. id. at 1453 (“ ‘[P]umping oil’ and not ‘leasing tracts’ is the aim of congressional [mineral leasing].” (quoting North Slope Borough v. Andrus, 642 F.2d 589, 608(D.C.Cir.1980) (alterations in original))).
The D.C. Circuit’s decision in Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 681 (D.C.Cir.1982), provides a more apt analysis. Cabinet Mountains Wilderness approved a BiOp that addressed only a three-year exploration plan because “[a]pproval was expressly limited to the proposed exploratory drilling aetivities[, and] further activities such as developmental exploration or mineral extraction would require a comprehensive examination of environmental effects.” Id. at 681. Although the D.C. Circuit did not place its express imprimatur on the duration of the drilling plan, it rejected the plaintiffs’ contention that the BiOp failed to account for cumulative impacts to grizzly habitat and determined that only concurrent “timber sales and roads were relevant in addressing the problem of cumulative impacts.” Id. at 683-84. The majority’s dismissal of Cabinet Mountains Wilderness in a footnote, see Op. at 522 n. 6, fails to grapple with the decision. I recognize that Cabinet Mountains Wilderness did not expressly hold that an agency may segregate a fixed period of operations in a BiOp, but Conner did not expressly hold that an agency may not do so. Cabinet Mountains Wilderness remains the more analogous authority.
We are faced with a BiOp addressing a distinct five-year plan for operations and *536 management, using existing infrastructure prior to planned improvements. Unlike Conner, the BiOp addresses the approved agency action in its entirety. And like Cabinet Mountains Wilderness, the O&M Plan is expressly limited to a limited period and range of activities; any further operation will require renewed environmental review. I therefore part company with my colleagues’ conclusion that the decision to address only five years of management activities was arbitrary and capricious.
II.
The majority holds that it is impossible to issue a rational no jeopardy conclusion in light of the Service’s finding that “long-term negative [population] trends[within Icicle Creek] are likely to continue.” Op. at 526 (quoting 2008 BiOp at 85) (modifications in original). The majority, however, fails to address the appropriate environmental baseline and merely assumes that the long-term trend is attributable to the current action. See Op. at 525-29. The 2008 BiOp includes the Hatchery’s historical structures and operations in the environmental baseline, see 2008 BiOp at 66, and Wild Fish Conservancy has abandoned on appeal its argument that this inclusion was improper.
Department of the Interior regulations define the environmental baseline as including
the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.
50 C.F.R. § 402.02. Of course planned operation and maintenance of the Hatchery cannot be included in the baseline. See Nat’l Wildlife Fed’n, 524 F.3d at 930-31 (“Although we acknowledge that the existence of the dams must be included in the environmental baseline, the operation of the dams is within the federal agencies’ discretion....”). The 2008 BiOp correctly determined that the O&M Plan will harm the Icicle Creek bull trout population. See, e.g., 2008 BiOp at 85 (“The proposed action is likely to cause impaired passage conditions for the bull trout in Icicle Creek each year.... ”). The BiOp, however, included the continued presence of Hatchery facilities, including obstructions to bull trout migration put in place during past operations, as components of the environmental baseline. See 2008 BiOp at 32; Nat’l Wildlife Fed’n, 524 F.3d at 930 (“The current existence of the [federal] dams constitutes an ‘existing human activity’ which is already endangering the fishes’ survival and recovery.” (quoting Alcoa v. Administrator, Bonnevile Power Admin., 175 F.3d 1156, 1162 n. 6 (9th Cir.1999))). Similarly, the BiOp included in the baseline a 70-year population decline and the risks that accompany a small remaining population. See BiOp at 66.
With the scope of both the proposed agency action and the environmental baseline in mind, the Service successfully “articulated a rational connection between the facts found and the [no jeopardy] conclusions made.” Pac. Coast, 426 F.3d at 1090 (citing Motor Vehicle Mfrs. Ass’n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The continuation of long-term negative population trends results from the continuing presence of obstacles to fish passage through Icicle Creek, and the Service’s inaction — its failure to remove those obstacles — is not a part of activity whose effects are considered in the BiOp. There is no *537 contradiction between the remaining effects and the Service’s conclusion that the present and long-term effects of the O&M Plan are not likely to reduce appreciably the bull trout’s likelihood of survival and recovery of the interim recovery unit.
Nor was it irrational for the Service to conclude that the O&M Plan, in concert with the environmental baseline, was “not likely to change the current distribution and abundance of the bull trout in the action area.” 2008 BiOp at 84. By reducing the period in which preexisting obstacles bar passage of bull trout to spawning grounds, the O&M Plan reduced the rate of decline, and we have no reason to disbelieve the Service’s conclusion that the marginal decline over a five year period— while improvements are made to the intake system and plans are laid for habitat rehabilitation — would affect distribution and abundance in an ecologically meaningful manner. This does not guarantee that there “won’t be fewer fish in 2011 than there were in 2006.” Op. at 527. But that claim was never made by the Service and is not necessary to its no-jeopardy conclusion.
The majority also contends that the 2008 BiOp fails to “explain how a ‘negative’ population trend in Icicle Creek could ‘improve ... the contribution of the Icicle Creek bull trout population to the survival of the bull trout.’ ” Op. at 528 (quoting 2008 BiOp 86-87). The majority, however, omits a crucial phrase from the quoted text. The BiOp states in full:
However, the effect of improved upstream passage conditions caused by the proposed action, as evidenced by some migratory bull trout observations in spawning habitat within Icicle Creek above the [Hatchery] in 2006 and 2007, when added to the environmental baseline should improve, albeit in only a small way, the contribution of the Icicle Creek local population to the survival of the bull trout.
Slowing a localized decline improves a population’s contribution to the broader survival of the species, both by preserving genetic diversity in the short term and widening the time frame in which further improvements can be made to reverse the trend entirely. More importantly, any contradiction in this analysis is irrelevant to the Service’s broader conclusion that “the proposed action ... is not likely to appreciably increase [the Bull Trout’s] recovery at the action area, core area, interim recovery unit, and range-wide scales.” 2008 BiOp at 86.
******
In sum, the Service provided a rational basis for its no jeopardy conclusion. To conclude otherwise requires neglecting the environmental baseline and distrusting agency experts’ analysis of the scope and relevance of continued population decline, mitigated by remedial agency action. I therefore disagree with my colleague’s conclusion that the Service’s analysis in the 2008 BiOp is irrational. For these reasons, I respectfully dissent from Parts II.A, II.B, II.E and III. of the majority opinion, but otherwise concur.