Jane DOE, Appellant,

v.

UNITED STATES of America, et al.

No. 84–5613.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 26, 1985.

Decided Jan. 17, 1986.

Rehearing En Banc Granted and Opinion Vacated, April 4, 1986.

Bruce J. Terris, Washington, D.C., for appellant.

Wendy M. Keats, Atty., Dept. of Justice, with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees. Katherine S. Gruenheck, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellees.

Before WRIGHT, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting opinion filed by Circuit Judge GINSBURG.

MIKVA, Circuit Judge:

We are asked to determine what the Privacy Act of 1974, 5 U.S.C. § 552a (1982), requires of a government agency and what its review provisions permit and require of the federal courts. Plaintiff Jane Doe sued the government to cause it to amend its records because they were false and prejudicial. She also requested damages. Because we find that the way in which the government kept its records relating to Jane Doe violated the Privacy Act, we reverse the district court's grant of summary judgment and remand the case to the district court with instructions to remand to the State Department. The State Department is instructed to bring its records into conformance with the mandate of the Pri-

vacy Act. Only then can Doe seek the *de novo* review in the district court to which she is entitled.

## I. BACKGROUND

In 1980 plaintiff Jane Doe applied to the State Department ("Department" or "State") for a job in the foreign service. She was asked to fill out various standard application forms and was interviewed by a Department agent. Doe was also required to grant State access to files maintained on her by the Veteran's Administration and other groups. After the State Department had compared Doe's application with her records it became concerned with some apparent discrepancies. Doe had said in her application that she had never suffered from any mental illness, but her VA and other records indicated that she was receiving a disability pension from the United States predicated in part on a mental condition.

In an effort to resolve this and other seeming inconsistencies, the State Department instructed its investigator to re-interview Doe. According to the agent's report of this interview, Doe stated that she never actually had a mental condition, but had lied to the VA about it in order to enjoy the tax benefits of disability income. The agent also reported that Doe told him that because she was a nurse it was easy for her successfully to pretend to have psychiatric problems. The agent's report became part of Doe's file at the State Department, but nothing came of the matter at the time because Doe dropped her application for a foreign service position.

In September of 1981 Doe was appointed to a high-level job in another government department. The job required that she obtain a security clearance. The government's investigation of Doe brought her State Department records to light, and Doe had trouble in gaining the security clearance necessary to make her appointment permanent. Pursuant to the Privacy Act, Doe filed a request with the State Department to obtain her records. 5 U.S.C. § 552a(d)(1). They were released to her. Doe was understandably upset that the State Department records indicated she was a liar and had cheated the United States government. In February of 1982 Doe applied to the State Department, under the Privacy Act, to have her records amended. 5 U.S.C. § 552a(d)(2).

During the time that the Department was considering her request for amendment, but only a few days before they denied that request, Doe informed the Department that the agent who had interviewed her had, in her opinion, sexually harassed her. The Department investigated this charge, and concluded that it was untrue. However, the Department does not seem to have taken the alleged sexual harassment into account as a factor that might have some bearing on whether Doe or the agent was telling the truth about what transpired during their interview. Rather, the two investigations proceeded on separate tracks.

In late March 1982 the State Department informed Doe that it had slightly modified that part of her records relating to the disputed interview, and corrected some other minor factual errors, but that the records remained substantially the same and still contained the agent's report of the second interview, with its allegations of impropriety. The State Department added Doe's rebuttal of the agent's charges to her permanent file, but refused to make a determination as to which version of the interview was true. Doe administratively appealed the State Department's action, 5 U.S.C. § 552a(d)(3), but was unsuccessful in gaining any further relief.

At no time during Doe's administrative challenge to the accuracy of the records did the Department conduct a hearing at which Doe and the agent could appear and their credibility be assessed. Nor did the Department conclusively determine their credibility through any other process. The State Department did review affidavits submitted by Doe and conducted a transcribed interview with Doe in the presence of counsel. The interview, however, was directed towards verifying the basis of Doe's charge of sexual harassment and not

towards assessing the veracity of the disputed records. The Department also asked its agent to review his interview notes and submit a supplementary report. After these procedures, however, the Department simply threw up its hands, said it could not resolve the conflict between the agent's and Doe's stories, and put everything in the record.

Doe then brought suit under the Privacy Act in United States District Court. 5 U.S.C. § 552a(g)(1). The district court granted summary judgment to the State Department. Although the district court ordered some minor modifications in Doe's records, it refused to order the Department to remove the offending matter. However, the district court did not allow Doe's records to remain unamended because the court believed the records were accurate. Rather, the district court expressed satisfaction with the Department's response to a difficult conundrum and concluded that "the State Department acted 'reasonably,' and that [Doe's records are] as 'accurate as is reasonably necessary.'" *Doe v. United States,* Civ.Act. No. 83–00951, slip op. at 11 (D.D.C. July 6, 1984).

On appeal, Doe asserts that the way in which the State Department maintained its records violates the Privacy Act, and that the district court erred in granting summary judgment to the Department.

## II. THE PRIVACY ACT

The Privacy Act of 1974 creates a panoply of duties and remedies for a broad range of situations in which the government might have caused harm to an individual in his reputation or employment by collecting or disseminating false or misleading information. The central command of the Act at issue here provides that agencies must keep accurate records. It provides that:

(e) ... Each agency that maintains a system of records shall—

(5) maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure

fairness to the individual in the determination....

To police the strong requirements placed on the agencies, Congress also provided for a system of petition and review. The Act provides that "[e]ach agency that maintains a system of records shall ... upon request by an individual to gain access to his record ... permit him ... to review the record...." § 552a(d). Furthermore, individuals are permitted by the Act to request that their records be amended. When an agency receives such a request, it must promptly make the requested correction or explain to the individual why it has refused to do so. § 552a(d)(2). Individuals are also granted a right of administrative review, § 552a(d)(2) & (3), and the right to file a statement with the agency setting out their side of the story. This statement must then be included by the agency whenever it discloses the disputed records. § 552a(d)(4).

The Act also provides for judicial review: Whenever any agency (A) makes a determination ... not to amend an individual's record in accordance with his request, or fails to make such review [as required]; [or] (B) refuses to comply with an individual request under subsection (d)(1) of this section; [or] (C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination ... that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or (D) fails to comply with any other provision of this section ... in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency....

§ 552a(g)(1).

The Act grants the reviewing court authority to amend the individual's records and provides that the reviewing court shall "determine the matter de novo." § 552a(g)(2)(A). Finally, the Act provides that the government is liable for damages and attorney's fees in cases where its ac-

tion was "intentional or willful." § 552a(g)(4).

## III. Doe's Claims

Doe's principal objection to the State Department's action is based on her claim that the Privacy Act does not permit an agency to refuse to decide if· the substance of its records is accurate. Doe maintains that the State Department was obliged to put the truth into its records and to conduct a hearing to determine the truth.

### A. *Accuracy and the Privacy Act.*

■ When confronted with Doe's request that her records be amended, the State Department conducted an investigation and placed Doe's rebuttal in her records. The Department, however, did not determine the truth or falsity of its agent's allegations or Doe's rebuttal. The Department explained that: "The State Department did not issue a conclusive determination saying, in so many words, that plaintiff made the statments attributable [sic] to her in the report. However, the State Department did expressly determine that the report met the accuracy requirements of the Privacy Act." Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment (Dec. 20, 1983), *Doe v. United States, supra.* The district court agreed that the Department's action, under the circumstances, met the requirements of the statute.

The Department asserts that it complied with section 552a(e)(5) and (d)'s requirement of accuracy by keeping records that *concluded* nothing, but merely contained conflicting allegations. The Department argues that the Act does not require perfect accuracy and that its records, inconclusive as they are, satisfy the Act's requirements. We disagree. The Act requires more of the Department than what it did here.

We fail to understand how Doe's records can be said to have been maintained with "such accuracy ... as is reasonably necessary to assure fairness to the individual," § 552a(e)(5), when all they contain are two sets of conflicting allegations. Because the records in question here do not state anything, but merely contain the contrary allegations of two parties to a conversation, it is beyond cavil that at least one of the statements in the records is false.

The legislative history of the Privacy Act makes clear Congress' concern with the dangers attendant in any but the most scrupulous and ethical system of recordkeeping. In the Senate Report on S. 3418, the Senate's version of what became the Privacy Act, the Senate stated that "an individual should have the right to discover if he is the subject of a government file, to be granted access to it, [and] to be able to *ensure the accuracy of it....*" S.Rep. No. 93–1183, 93d Cong., 2d Sess. 20 (1974), U.S.Code Cong. & Admin.News 1974, 6916, 6935 (emphasis added). The Senate also stated that the purpose of the legislation "is to promote accountability, responsibility, ... and open government ... with respect to all of [the government's] manual or mechanized files." *Id.* at 1, U.S.Code Cong. & Admin.News 1974, at 6916. The individual's right to accuracy and the government's corresponding duty of responsibility cannot be vindicated by mere compilation of conflicting reports.

To hold otherwise would be to open the files of government wide to unsubstantiated rumors and· character assassination of the most damaging sort. The Privacy Act leaves no room for the retention of records that will have a highly damaging effect on individuals—unless, of course, they are accurate. The House Report on the Privacy Act vividly expresses Congress' desire that government be accountable in its recordkeeping procedures. The House stated that:

> George Orwell's famous book *1984,* published a generation ago, focused public attention on the fictional fish bowl existence of human life in the "Big Brother" era and the potential threats to any free system posed by some political-technical-social innovations.
>
> During the "cold war" period of the late 1940s and 1950s, widespread abuses

engulfed various governmental and private efforts to ferret out alleged "subversives." Intellectual dissent was driven somewhat into hiding. Terms such as "security risk," "loyalty oaths," "pinko," and guilt by association came into common usage.... Indiscriminate use of dubious "informers," wiretapping, surveillance, neighborhood snooping, and other flagrant invasions of personal privacy were seen more and more.

H.R. Rep. No. 93–1416, 93d Cong., 2d Sess. 4–5 (1974).

We are not unmindful of the State Department's dilemma, and its efforts to resolve the matter. The State Department's actions here are hardly equivalent to the abuses of the McCarthy era. The intention of the drafters of this statute, however, was to ensure a high degree of integrity in the records and record-keeping procedures of government. The Privacy Act serves as a first line of defense against government irresponsibility. More than just the most flagrant abuses are prohibited. Thus, if the individual's right to be protected from McCarthyesque innuendo in government records is to be vindicated, the government cannot casually file damaging reports with merely a nod in the direction of the protesting individual. Even though the "informer" who has so harmed Doe's chances of achieving governmental office works for the government itself, we cannot allow the government to rely on his bare assertions without at least affirming that *it* believes what he has reported. Without this requirement, the sort of unsubstantiated character assassination that the Privacy Act was, in part, designed to guard against would have a foot in the door of government.

We agree with the common-sense observation that the Act does not require perfect accuracy. The State Department is correct in pointing out that, ultimately, what transpired in its agent's interview with Doe is unknowable and that no procedure will guarantee perfect accuracy in the records. To err in decision is unfortunately unavoidable even for judges, as well as juries and

administrative decision-makers. But these decision-makers have to reach a decision. It will not be easy to decide which of the two reports here is correct. Nor will the process be perfect or error-free. Such a determination, however, is required by the Privacy Act. If the State Department chooses to believe and stand behind its agent's report, it is free to include that report in its files. It is not free, however, to include that report *without* concluding that it is correct.

Our dissenting colleague states that "Doe did urge a matter which, if borne out, would have placed her case in a very different posture. She accused the interviewing agent of 'sexual misconduct'...." Dissent at 917. The dissent implies that the Department investigated these charges and determined that they had no bearing on Doe's contention that the agent's interview report was inaccurate. *See* dissent at 917. This is simply not the case. The State Department's investigation of Doe's allegations of sexual misconduct occurred *after* it had decided not to amend her records in conformance with her Privacy Act request. The investigation was designed to determine if there was cause to bring sexual misconduct charges against the agent, and it was concluded that no such charges were warranted. The Department did not focus on the question of whether the alleged sexual misconduct, even if not proved to the degree necessary to support any action against the agent, had any impact on the believability of the agent's interview report. For reasons known only to itself, the State Department was not willing to devote the same energy and attention to determine what really transpired at the interview as it was to the question of its agent's alleged sexual misconduct. Despite Doe's specific assertion that the only reason she had come forward with the allegations of sexual improprieties was her desire to vindicate her version of the interview, the Department declined to consider Doe's amendment request in light of the allegations.

Nor is the dissent correct to say that "Doe did not further pursue those [sexual]

misconduct allegations." Dissent at 917. The district court was informed of this aspect of Doe's encounter with the State Department. The Privacy Act requires *de novo* review in the district court. Had the district court properly conducted such a review, it would have taken Doe's allegations into account in determining the accuracy of the record. This is all Doe wanted to accomplish in coming forward with the allegations. Doe had no responsibility or reason to pursue the charges with an eye toward punitive action against the special agent; that she declined to do so is completely without bearing on her Privacy Act claim.

■ Thus, we would have been much less troubled had the State Department retained the records in question here and opted for the agent's side of the story. The difference between this and what the Department actually did is crucial. We have every confidence that the members of the executive, sworn to uphold the law and faithfully perform their duties, will not affirm that they stand behind the accuracy of a record unless they are in fact convinced that it is accurate. Assuring that only when the government stands behind the material in its files will that material be retained is an important safeguard against abuse and is mandated by the Privacy Act. This standard is far different from merely requiring agencies to act reasonably. The Privacy Act requires that government records *themselves* be maintained "with such accuracy ... as is reasonably necessary," not that government officials must act reasonably. It may be reasonable, as the district court here held, to fill government records with conflicting allegations, but it does not ensure reasonably accurate *records*. Inaccurate records, not unreasonable procedures *per se*, are what the Privacy Act was designed to eliminate.

### B.  *De novo review.*

■ Despite our finding that the State Department failed to comply with the Privacy Act, it might be argued that the appropriate remedy would be for the district court to ignore the Department's failures and determine *de novo*, pursuant to § 552a(g)(2)(A), what Doe's records should say. However, we do not think this would be appropriate or consonant with the statute. We hold that the statute's guarantee of *de novo* review in the district court means that the agency itself must initially make a determination as to its records' accuracy. *De novo* specifies not only a *standard* of review, but also connotes again, for a second time. *See generally* Black's Law Dictionary 392, 649 (5th ed. 1979). The statute's guarantee of a *de novo* determination thus implies the promise that the agency must *determine* the matter. What the State Department did here fell short of a determination. Unless the Department has itself determined the matter, a district court can only determine it, not determine it *de novo*.

Accordingly, instead of sending this case back to the district court for it to reconsider the matter in light of our decision, we believe the matter must be sent from the district court back to the State Department for an initial determination. Pursuant to § 552a(d)(2)(B)(i) and (ii), the Department must choose which version, Doe's or the agent's, it chooses to believe. If State declines to correct its records, it must affirm that it chooses to stand behind the agent's version, and that the records thus meet the standard of accuracy mandated by the Act. If and when this case returns to the district court from the State Department, it will then be the district court's obligation to determine *de novo* if the Department's records meet the Act's accuracy requirement.

■ The scope of *de novo* review is broad and encompasses the consideration of new evidentiary matter. *Cf. Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284–85 (D.C.Cir.1981); *Cabinet Mountain Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682–83 (D.C.Cir.1982). The usual deference accorded administrative proceedings is inapplicable. *De novo* review represents a complete break with what has gone before.

It is true that because *de novo* review of administrative actions imposes a substantial burden on courts, "[t]he applicability of *de novo* review to administrative actions is limited and is generally not presumed in the absence of statutory language or legislative intent to the contrary." *Cabinet Mountain, supra,* at 682. Where, however, a statute is as clear as the Privacy Act in its call for *de novo* review, there can be no blinking the judiciary's obligation.

Thus, the district court was wrong to conclude that it could confine its review to the reasonableness of the Department's procedures and decline to address the accuracy of the records. *See Doe, supra,* slip op. at 9–10. Section 552a(g)(1)(A) provides for review of an agency decision not to amend its records. Section 552a(g)(2)(A) says this review will be *de novo.* Section 552a(g)(1)(C), which offers an alternate route to review in the district court, and is only available if "a determination is made which is adverse to the individual" because of faulty records, is also subject to sub-section (g)(2)(A)'s requirement of *de novo* review. Thus, for a district court to review an agency's refusal to amend, it must put itself in the agency's place and ask if the records in question satisfy the Privacy Act's requirement of accuracy. *See Doe v. United States Civil Service Commission,* 483 F.Supp. 539, 555 (S.D.N.Y.1980); *Savarese v. United States Dep't of Health Education & Welfare,* 479 F.Supp. 304, 306–07 (N.D.Ga.1979), *aff'd,* 620 F.2d 298 (11th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981).

The dissent also appears hostile to the Act's requirement of *de novo* review. Our dissenting colleague complains that "the majority ... states, the district court must independently decide, through *de novo* review, which account is true, and which one is false." Dissent at 917. The dissent goes on to approve the district court's grant of summary judgment because a factual determination as to what occurred at the interview would be difficult to make. *See* dissent at 918.

We fail to understand why the dissent contrives to ignore the Act's clear requirement of *de novo* review. We have already shown that *de novo* review may be onerous, and should not be lightly inferred. In this case, however, there is nothing to infer; Congress has expressed its will with unmistakable clarity. It is not the province of the judiciary to substitute its policy judgment for that of the legislature. Unless and until Congress sees fit to amend the Privacy Act, courts must adhere to its terms and consider Privacy Act suits *de novo.* This means that a court must put itself in the agency's place and conduct the same inquiry the agency has, without any deference to the agency's determination. (Even as a matter of first principle, it is not clear that the dissent's seeming preference for limited judicial review is correct. The judiciary is an institution uniquely devoted and suited to determining factual controveries. In carrying out a task as sensitive as ensuring the accuracy of the government's records, it is not at all odd that Congress should employ this finely-honed, truth-divining mechanism as a check on the inclusion of inaccurate or questionable information in the government's records.)

### C. *Other considerations.*

Our interpretation of the Privacy Act is buttressed by an examination of its subsection (d). 5 U.S.C. § 552a(d). Subsection (d)(3) provides that when an agency refuses an individual's amendment request the individual may file a statement with the agency indicating the individual's reasons for disagreeing with the agency's action. Subsection (d)(4) provides that after such a statement has been filed the agency must include the individual's statement of disagreement whenever it releases his records. Thus, the State Department's resolution of the dispute here did no more than afford Doe a remedy to which she already had a statutory right. The Department did not fashion a Solominic compromise when confronted with a hard question of credibility. Instead it ducked the issue, and then crafted a "solution" that amounted to no more than it would have been obliged

to do even had it found against Doe. In sum, the problem with the State Department's solution is that it entirely deprived Doe of the opportunity to have her claim evaluated and decided. Such a process may be difficult, time-consuming and tedious for the agency involved. The State Department would apparently prefer to avoid it. However, the Privacy Act requires no less.

Our dissenting colleague asserts that it is "a fair accommodation ... simply to report the divergent accounts." Dissent at 917. We are baffled by the dissent's conclusion that the State Department may therefore decline to decide if it believes its *own agent's report* is in fact accurate. We agree that it is *fair* to allow Doe to put her version of the incident into the record. Indeed, Congress, presumably because of considerations of fairness, *mandated* that *any individual,* no matter how incredible his or her version of events, be allowed to supplement the record. By excusing the Department from its duty of accuracy, however, the dissent twists recognition of this *congressionally mandated* right into a limitation on the right. Both the Department and the dissent are saying that Doe should be satisfied that the government, in its munificence, has elected to follow part of the law and include her version of events in the record. We continue to believe, however, that the Act requires *both* accurate records *and* the inclusion of an individual's rebuttal in all circumstances.

We believe the dissent misapprehends our insistence that the Department determine that its records are accurate. We do not believe that the Department is required "to declare definite and certain things that are not." Dissent at 918. We do not believe that the Department is required to determine the truth of everything in its records to the nth degree. Nor do we believe that the Department must exclude only material that it is 100% convinced is false. We hold only that, in the circumstances of this case, the Department must make some decision; it must at least conclude that it is convinced of the accuracy of its own agent's report. If the Department

can say only that "we can't tell, we don't know," then we are certain that the records in question here do not meet the standard of accuracy mandated by the Privacy Act.

■ The Privacy Act does not require any particular procedures or standard of proof or persuasion in agency determinations. As the district court correctly noted, Congress clearly rejected mandating any sort of procedural apparatus to accompany the substantive commands of the Act. *See Doe v. United States, supra,* slip op. at 9; *see also* S. Rep. No. 93–1183, *supra,* at 62–63, U.S.Code Cong. & Admin.News 1974, at 6977 (discussing subsection 201(d)(2)(F) of S. 3418, which would have required an agency *hearing* at the individual's request, but which did not become part of the Privacy Act). Nor are agencies required to adhere to any particular standard of proof when choosing between conflicting versions of reality. The myriad of procedural and bureaucratic forms such a determination may take would make prescription inappropriate. Our sole concern today is to make clear that the Privacy Act requires an agency to stand behind the reports of its agents before it can make the reports a part of its official records. Section 552(e)(5) cannot fairly be read to mean anything less.

This is not a case, as suggested by the government brief, where an agency wished to retain in its records statements made by a private citizen, or someone the agency had interviewed. In assessing the standing of a job applicant in the community, for instance, it might be appropriate to note that all of his neighbors had averred that he was a wife-beater—even if the agency had not independently verified this fact. The views and opinions of neighbors are probative of one's standing in the community. And it may be that such information is relevant to a government investigation. (Indeed, Doe's own files contain reports from her neighbors that she is a brusque and unfriendly sort.) But the views and opinions of an agency investigator have a different nature; because the agency itself

has generated these reports and they reflect the work of the agency's own investigator, the agency must stand behind them or reject them. Thus, the agency here has itself made and recorded highly prejudicial reports about an applicant but refused to say that it believes them. A file such as this may be of interest to an agency. It cannot, however, be defended on the ground that it merely records what someone said. The usefulness of such a record is irrelevant in the face of the clear direction of the Privacy Act forbidding its retention unless it meets the requisite standard of accuracy. Even in the case of hearsay entered into an agency record for other than the truth of the matter asserted, we think that the Privacy Act may well require an agency to consider the veracity of any such material. Since that question is not before us today, however, we need not address it.

We do not hold that it is never permissible for an agency to include conflicting information in its files. By way of illustration, we believe that *R.R. v. Department of Army*, 482 F.Supp. 770 (D.D.C.1980), is not at odds with the result reached today. In *R.R.* the court stated that "[o]n occasion accuracy is achieved only by allowing a disputed question of fact or judgment previously recorded to remain in the record, qualified by subsequent data." *Id.* at 773. An examination of the case, however, clearly demonstrates that the Department's reliance on this statement is misplaced.

*R.R.* concerned the records of a serviceman who had been discharged because of a psychiatric disability. The discharge had occurred nearly thirty years before the suit. The army psychiatrist who had examined the plaintiff before his discharge had concluded that his condition was neither caused nor aggravated by his army service. This diagnosis was predicated, however, at least in part, on erroneous facts furnished to the doctor. At the time the district court considered the case, the plaintiff's file also contained a more recent medical evaluation, based on accurate information, that contradicted the earlier one. Judge Gesell was clear "[t]hat the Privacy Act

contemplates ... expungement and not merely redress by supplement...." *Id.* at 774. The court therefore ordered factual inaccuracies in the plaintiff's records corrected. *Id.* at 775.

With respect to the first psychiatric evaluation contained in plaintiff's files, however, Judge Gesell was more cautious. While he was certain that the Privacy Act's authorization of actions for expungement and revision "appl[ied] to errors of judgment or opinion," such as a psychiatrist's diagnoses, he concluded that "[u]nder the circumstances, the challenged medical judgments are not so thoroughly discredited as to justify their deletion or contradiction in the record." *Id.* at 774–75. The court felt that a thirty-year-old opinion, formulated in good faith, and based upon consideration of a number of factors, weighted in an unknowable fashion, was simply not subject to accurate revision. The best record of what had occurred at the time of plaintiff's discharge was the contemporaneous psychiatric report. In this special circumstance the *R.R.* court declined to require the Army to reconstruct the diagnosis that would have been made thirty years earlier had the examining doctor not been furnished inaccurate information.

The facts of this case are far different from those presented in *R.R.* There may be other special circumstances that would warrant a court's approving a solution such as that arrived at in *R.R.*, but they are not presented in this case. As we have indicated above, only one of the versions of what Doe told the investigator is accurate. The means are available for making a contemporaneous judgment as to which version is accurate; however difficult that judgment may be it is no more difficult than many other credibility determinations that are routinely made.

### CONCLUSION

The Privacy Act imposes a substantial duty on the government to maintain its records with accuracy and to avoid harming individuals by keeping sloppy or willfully inaccurate records. This duty cannot be

discharged by the maintenance of conflicting reports and the lament that it would be too difficult to determine the truth. A report generated by the agency for the agency must be validated by the agency. That this is a difficult task does not justify evasion of the plain mandate of the Privacy Act. The decision of the district court in this case is therefore

*Reversed and Remanded.*

GINSBURG, Circuit Judge, dissenting:

The court attributes to the Privacy Act a rigidity I do not believe Congress intended. I therefore dissent.

The Act instructs each agency to maintain all records used in making determinations about any individual "with such accuracy ... and completeness as is reasonably necessary to assure fairness to the individual." 5 U.S.C. § 552a(e)(5). This case concerns the application of that instruction to a situation in which an experienced security agent and the individual he interviewed for a position recounted differently what the interviewee said at an interview. If the agency is to keep a record of the interview, the court holds, the agency must decide where "the truth" lies; and if the agency accepts its security agent's version, the district court, on request of the interviewee, must redetermine the matter *de novo*. The agency may not, in the majority's view, place both versions in the record without explicitly stating that it believes the agent's version to be accurate.[1] In succession, the majority then states, the district court must independently decide through *de novo* review, which account is true, and which one is false.

Congress, in my judgment, did not so straitjacket the agency. If the agency finds from the record, as the State Department did here, that "there is no reason to question the [agent's] integrity," Joint Appendix (J.A.) 64, then I think it a fair accommodation, fully consistent with the Act's terms and purposes, simply to report the divergent accounts. I agree with the district judge that, in the circumstances this case presents, accuracy is best served, not by labeling one account the whole truth, and the other a lie, but by reporting correctly the contradictory accounts of the two sole participants in the episode in question. *See Doe v. United States,* No. 83–951 (D.D.C. July 6, 1984).

Doe did urge a matter which, if borne out, would have placed her case in a very different posture. She accused the interviewing agent of "sexual misconduct" in the course of the interview and implied that her reaction caused the agent to distort and falsify the interview report. The State Department promptly investigated and found Doe's allegations of sexual misconduct on the part of the agent to be meritless. Doe did not further pursue those misconduct allegations. Nor did she suggest any other reason to doubt the veracity, motives or competence of the interviewer. The security agent was experienced in his work and apparently had proved reliable in the past. The State Department, as earlier observed, explicitly determined that there was no cause to question his integrity.

Having made that critical determination, the Department, I believe, was not required by the Privacy Act to engage in an adversarial proceeding over the interview, yielding a decision—much in the manner of a

---

1. The court properly avoided dictating "any particular procedures" to the agency. *See* majority opinion (maj. op.) at 915. Doe, in contrast, cast her entire case in a procedural frame. She emphasized here and in the district court that "[t]his case does not involve the truth or falsity of the various charges and counter-charges." Instead, she urged, the issue is the quality of investigation an agency must undertake before placing "damaging allegations in a person's files." Appellant's Brief at 14; *see* Doe v. United States, No. 83–951, slip op. at 8 (D.D.C. July 6,

1984). She described as essential an "extensive [agency] investigation," Appellant's Brief at 32, which would stretch beyond Doe and the security agent to reach other individuals, "including physicians who might have had information about [Doe's] motives." *Doe, supra,* slip op. at 8. Because the Department of State did not so investigate, Doe concluded, she is entitled to an order, preferably here and now, directing the Department to delete the agent's report. *See* Appellant's Brief at 57. *See also infra* note 3.

judge or jury—for one side or the other. *See* majority opinion (maj. op.) at 912-13. I cannot locate in the Act the unyielding direction the majority finds there requiring the agency always to adjudicate so as to record truth, rather than to adjust a file equitably to reveal genuine ambiguity. As the district court several times observed, the only charge Congress gave the agencies is to maintain records "with such accuracy ... as is reasonably necessary to assure fairness" to the individuals involved. 5 U.S.C. § 552a(e)(5). And I am satisfied that the State Department fulfilled that charge in Doe's case. *Cf. Savarese v. Department of Health, Education, and Welfare,* 479 F.Supp. 304, 306 (N.D.Ga.1979) ("if the court determines that the agency has done what is reasonable in assuring the accuracy of the information included, no more is required"), *aff'd mem.,* 620 F.2d 298 (5th Cir.1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 858, 66 L.Ed.2d 801 (1981); *Smiertka v. Department of the Treasury,* 447 F.Supp. 221, 226 n. 35 (D.D.C.1978) (key term in Act is "reasonableness"; agency's compliance with this standard is achieved by "balancing all of the relevant competing interests at stake"), *remanded on other grounds,* 604 F.2d 698 (D.C.Cir.1979).

I do not "excus[e] the Department from its duty of accuracy." Maj. op. at 915. I simply do not share the majority's enthusiasm for forcing an agency to declare definite and certain things that are not. Had the Department embraced its agent's account as "truth" and allowed Doe to supplement the record with an account the Department found "false," the Department would have accorded Doe the *"congressionally mandated* right," *id.,* advertised

by the majority. I find no impermissible avoidance in the Department's reluctance to take that course.

The district court, it bears emphasis, recognized that generally, Privacy Act cases do not lend themselves to disposition by summary judgment; in the typical case, the district court observed, it *is* possible to make a determination as to the accuracy of filed material. *See Doe, supra,* slip op. at 10, 11. The district court ruled narrowly and only on the case of an unwitnessed, untaped interview, in which what the interviewee said is indeed "unknowable" by third persons. *See* maj. op at 912. The "whole truth" in such cases, may well include some part of what each of the two participants recounted, so that a file setting out both versions may be more accurate than a record embracing only one side's story.

In any event, I do not believe that the district court's ruling—narrowly tied as it was to a security agent's report of words spoken at an interview meeting unattended by any third person—opens the floodgates to unchecked government collection and retention of "unsubstantiated rumors" or "McCarthyesque innuendo." *Id.* at 911, 912.[2] So long as close case-by-case court review is available, "sloppy or willfully inaccurate" record keeping, *id.* at 916, can be held at bay.

———

The court has decided a novel case under the Privacy Act. In my judgment, it has done so in a way Congress did not order, one likely to impel agencies almost always to "opt[ ] for [their] agent's side of the

---

**2.** I do not fully grasp the relevant distinction apparently drawn by the court, *see* maj. op. at 915–916, between statements made by third parties and statements made by the job seeker. The former, the court suggests, may fall outside this decision's rule of double credibility determinations (first by the agency, then *de novo* by the district court). It is not clear why a security agent's rendition of what "neighbors" said is any less "the work of the agency's own investigator" than is the agent's account of what the job seeker said. Moreover, reports of what others

said of an applicant seem to me at lease as vulnerable to distortion and falsification as reports of what the immediately concerned person stated. Furthermore, the grave concerns Congress expressed about, *e.g.,* dubious informers and snooping neighbors, *see* H.R.Rep. No. 93–1416, 93d Cong., 2d Sess. 4–5 (1974), would appear to require particular vigilance—often independent verification of damaging information—when third party statements are collected. *See Doe v. United States Civil Service Commission,* 483 F.Supp. 539, 579–80 (S.D.N.Y.1980).

story." *Id.* at 913.[3] The truth about Doe's words is "unknowable" to persons other than Doe and the security agent. It may lie in the middle ground between the divergent accounts affirmed by two witnesses.[4] I do not regard a record as inadequate or inaccurate under the Privacy Act if it simply indicates that prospect. I therefore dissent.

---

**3.** Doe, it appears, has not prevailed on her "procedural rights" plea. *See supra* note 1. The court states that *de novo* judicial review is "broad and encompasses the consideration of new evidentiary matter," maj. op. at 913; but as to the agency, the majority opinion merely suggests that the Department determine the credibility of Doe and the security agent through some process. *Id.* at 912.

**4.** *Cf.* A. Strindberg, *A Dream Play* 48 (M. Meyer tr. 1973) (In an exchange on truth, the Philosophy Dean asks: "What is truth?" The Law Dean replies: "That which can be proved by two witnesses.").